Alan Harris (SBN 146079)
David Zelenski (SBN 231768)
HARRIS & RUBLE
6424 Santa Monica Boulevard
Los Angeles, California 90038
Telephone:  (323) 962-3777
Facsimile:  (323) 962-3004
aharris@harrisandruble.com
dzelenski@harrisandruble.com

John P. Dorigan (SBN 98964)
LAW OFFICES OF JOHN P. DORIGAN
78-560 Via Bolero
La Quinta, California 92253
Telephone:  (760) 564-3804
Facsimile:  (760) 564-3807
jpdorigan@aol.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLETTE McDONALD, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>AIRPORT TERMINAL SERVICES, INC., and DOES 1–100, inclusive,<br><br>        Defendants. | Case No. EDCV 11-01946 VAP (SPx)<br><br>**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT AND CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS**<br><br>*Assigned to Hon. Virginia A. Phillips*<br><br>Hearing Held:  June 24, 2013<br>Time:  2:00 p.m.<br>Courtroom:  2 |

# *Table of Contents*

I.    *Introduction* ...................................................................................... 1

II.   *The Settlement Class Is Certifiable Under Rule 23* .......................... 1

      A.    *Numerosity* ............................................................................ 2

      B.    *Commonality* ......................................................................... 3

            1.    *Plaintiff's Meal-Period Claim* ...................................... 3

            2.    *Plaintiff's Expense-Reimbursement Claim* ................... 8

            3.    *Plaintiff's Improper-Seating Claim* ............................ 10

            4.    *Plaintiff's Remaining, Derivative Claims* ................... 11

      C.    *Typicality* ............................................................................ 15

      D.    *Adequacy* ............................................................................ 16

      E.    *Predominance* ..................................................................... 19

III.  *The Proposed Settlement Is Fair, Reasonable, and Adequate* ............... 20

      A.    *Non-Collusive Negotiations* ................................................ 20

      B.    *Strength of Plaintiff's Case* ................................................ 21

      C.    *Risk, Exposure, Complexity, and Likely Duration of Further Litigation* ............................................................................ 21

      D.    *Risk of Maintaining Class-Action Status Throughout Trial* ......... 21

      E.    *Amount Offered in Settlement* ............................................ 21

      F.    *Extent of Discovery* ............................................................ 23

      G.    *Experience and Views of Counsel* ....................................... 24

  *H.  Reaction of the Settlement Class* ...................................................................24

*IV. Attorney's Fees* ...............................................................................................24

*V. Notice and Administrative Procedures* ..........................................................25

*VI. Conclusion* ......................................................................................................25

SUPPLEMENTAL MEM. OF P. & A. IN SUPP. OF MOT. FOR PRELIMINARY APPROVAL, *ET AL.*

1

## *Table of Authorities*

2

3

### *Cases*

4

Abdullah v. U.S. Sec. Assocs., Inc.
  2011 U.S. Dist. LEXIS 156685 (C.D. Cal. filed Jan. 11, 2011)....................................9

5

6

Angeles v. U.S. Airways, Inc.
  2013 WL 622032 (N.D. Cal. filed Feb. 19, 2013).......................................................6, 7

7

8

Blackwell v. SkyWest Airlines, Inc.
  2008 WL 5103195 (S.D. Cal. filed Dec. 3, 2008)..........................................................7

9

10

Boeing Co. v. Van Germet
  444 U.S. 472 (1980)........................................................................................................24

11

12

Bright v. 99¢ Only Stores
  189 Cal. App. 4th 1472 (2010) ......................................................................................10

13

14

Brinker Restaurant Corp. v. Superior Court
  53 Cal. 4th 1004 (2012) ...........................................................................................5–6, 19

15

16

Cal. Dairies, Inc. v. RSUI Indem. Co.
  617 F. Supp. 2d 1023 (E.D. Cal. 2009) ..........................................................................9

17

18

Carter v. Cal. Dep't of Veterans Affairs
  38 Cal. 4th 914 (2006) ...................................................................................................13

19

20

Cicero v. DirecTV, Inc.
  2010 WL 2991486 (C.D. Cal. filed July 27, 2010) ......................................................25

21

22

Davis v. Astrue
  250 F.R.D. 476 (N.D. Cal. 2008)...................................................................................16

23

24

Escano v. v. Kindred Healthcare Operating Co.
  2013 WL 816146 (C.D. Cal. filed Mar. 5, 2013) .........................................................13

25

26

Gallardo v. AT&T Mobility, LLC
  --- F. Supp. 2d ---, 2013 WL 1334007 (N.D. Cal. filed Mar. 29, 2013) ......................11

27

28

Gen. Tel. Co. of the SW v. Falcon
    457 U.S. 147 (1982).............................................................. 5, 16

Hanlon v. Chrysler Corp.
    150 F.3d 1011 (9th Cir. 1998) ..................................................... 15

Harris v. Investors' Business Daily, Inc.
    138 Cal. App. 4th 28 (2006) ........................................................ 14

Hopkins v. Stryker Sales Corp.
    2013 WL 496358 (N.D. Cal. filed Feb. 6, 2013)........................ 25

In re "Agent Orange" Prod. Liability Litig.
    818 F.2d 145 (2d Cir. 1987) .......................................................... 7

Jones v. Spherion Staffing LLC
    2012 WL 3264081 (C.D. Cal. filed Aug. 7, 2012)................. 13, 23

McDonald v. Ricardo's on the Beach, Inc.
    2013 WL 228334 (C.D. Cal. filed Jan. 22, 2013)........................ 11

Morales v. Trans World Airlines, Inc.
    504 U.S. 374 (1992)....................................................................... 6

O'Donnell v. TD Ameritrade, Inc.
    2008 WL 8976220 (S.D. Cal. filed June 17, 2008)..................... 19

Plaisted v. Dress Barn, Inc.
    2013 WL 300913 (C.D. Cal. filed Jan. 25, 2013)........................ 10

Radcliffe v. Experian Info. Solutions, Inc.
    715 F.3d 1157 (9th Cir. filed as amended May 2, 2013)....................... 17, 18

Romero v. Producers Dairy Foods, Inc.
    235 F.R.D. 474 (E.D. Cal. filed Apr. 19, 2006) ....................... 7, 8

Rowe v. N.H. Motor Transp. Ass'n
    552 U.S. 364 (2008)........................................................................ 6

Silva v. U.S. Bancorp
    2011 WL 7096576 (C.D. Cal. filed Oct. 6, 2011) ...................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Singer v. Becton Dickinson & Co.
  2010 WL 2196104 (S.D. Cal. filed June 1, 2010) ....................................... 25

Stearns v. Ticketmaster Corp.
  655 F.3d 1013 (9th Cir. 2011) ....................................................................... 9

Vasquez v. Coast Valley Roofing, Inc.
  266 F.R.D. 482 (E.D. Cal. 2010) ................................................................. 19

Wal-Mart Stores, Inc. v. Dukes
  131 S. Ct. 2541 (2011) ................................................................................... 5

Yokoyama v. Midland Nat'l Life Ins. Co.
  594 F.3d 1087 (9th Cir. 2010) ............................................................... 9, 20

**Statutes**

49 U.S.C. § 41713 ................................................................................................ 6

Cal. Bus. & Prof. Code § 17200 ............................................................... 11, 14

Cal. Bus. & Prof. Code § 17203 ...................................................................... 14

Cal. Bus. & Prof. Code § 17208 ...................................................................... 14

Cal. Civ. Proc. Code § 338 .............................................................................. 14

Cal. Lab. Code § 201 ................................................................................ 11, 12, 13

Cal. Lab. Code § 202 ................................................................................ 11, 12, 13

Cal. Lab. Code § 203 ............................................................................... 13, 14

Cal. Lab. Code § 226 ................................................................... 12, 13, 14, 20

Cal. Lab. Code § 226.7 ..................................................................................... 20

Cal. Lab. Code § 512 ............................................................................... 4, 5, 6

Cal. Lab. Code § 1198 ..................................................................................... 10

Cal. Lab. Code § 2698 ............................................................ 10

Cal. Lab. Code § 2699 ............................................................ 10

Cal. Lab. Code § 2802 ........................................... 8, 9, 10–11, 12

**Rules**

Fed. R. Civ. Proc. 23 ...................................................... *passim*

**Regulations**

8 Cal. Code Regs. § 11090 .......................................... 8, 10, 11

**Secondary Sources**

Richard A. Nagareda
  Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97
  (2009) .............................................................................. 5

William W Schwarzer, *et al.*
  California Practice Guide:  Federal Civil Procedure Before Trial
  (The Rutter Group 2013) ............................................... 16

*I.    Introduction.*

On May 23, 2013, Plaintiff Collette McDonald filed a Motion for preliminary approval of a class-wide settlement reached with Defendant Airport Terminal Services, Inc. ("ATS") in the above-captioned action. The Motion sought to certify a Settlement Class of all non-exempt individuals employed by ATS in California since November 2, 2007. The proposed settlement, embodied in a Settlement Agreement and General Release ("Settlement Agreement") executed by the Parties on May 7, 2013, would resolve Settlement Class members' claims for (a) the failure to pay meal-period wages for documented missed meal breaks, (b) the failure to reimburse for uniform-maintenance expenses, and (c) the failure to provide adequate workplace seating.[1] The settlement would also resolve Settlement Class members' claims for (d) "continuing wages," (e) pay-stub damages, and (f) unfair competition that are derivative of the above failures to provide meal-period compensation and uniform-maintenance reimbursement.

The hearing on the Motion took place on June 24, 2013. On the day of the hearing, the Court issued a Tentative Ruling denying the Motion, principally on the ground that Plaintiff had not sufficiently established a basis for class certification under Federal Rule of Civil Procedure 23.[2] At the close of oral argument, the Court agreed to take the Motion under submission, and it permitted Plaintiff to file supplemental briefing as to the points raised in the Tentative no later than July 8, 2013. Plaintiff hereby submits this Supplemental Memorandum addressing those points.

*II.    The Settlement Class Is Certifiable Under Rule 23.*

As the Court's Tentative correctly explains, "[p]arties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23." (June 24, 2013, Tentative at 3.) Under Rule 23, a plaintiff must demonstrate that: / / / / /

---

[1] Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Settlement Agreement. A copy of the Settlement Agreement is attached as Exhibit 1 to the Declaration of Alan Harris filed herewith.

[2] A copy of the Tentative Ruling is attached as Exhibit 2 to the Declaration of Alan Harris filed herewith.

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Proc. 23(a). A plaintiff must also demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id. at subsec. (b)(3). According to the Tentative, Plaintiff's proposed Settlement Class satisfies the numerosity requirement, and her attorneys will adequately and fairly represent the interests of the Settlement Class. However, also according to the Tentative, Plaintiff has not provided sufficient evidence establishing commonality, typicality, or predominance. Furthermore, the Tentative explains that, because the Settlement Agreement permits Plaintiff to seek an incentive award of up to $5,000, she herself is not an adequate representative. This Memorandum addresses each of those issues.

### A.    *Numerosity.*

The Motion for preliminary approval seeks to certify a Settlement Class consisting of "all non-exempt employees who were employed by ATS within California from November 2, 2007, to the date of entry of preliminary approval of the Settlement Agreement." (Settlement Agreement § 3.) There are approximately 1,098 individuals who fall within the Settlement Class definition, each of whom was employed as an "airport agent." (July 8, 2013, Supplemental Decl. of Alan Harris in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class ("July 8, 2013, Harris Decl.") ¶ 4.) The Settlement Class defined in the Settlement Agreement, then, is simply an alternative formulation of the Class defined in the Complaint, which pleading defines the Class in terms of various airport-agent job titles. (See Dec. 9, 2011, Notice of Removal of Civil Action to U.S. Dist. Court Ex. 1 ("Nov. 2, 2011, Compl.") at ¶ 19.) Plaintiff herself was employed by ATS as a customer-service agent from approximately mid-2005 to approximately mid-2011, and she is

therefore one of the 1,098 Settlement Class members.  (July 8, 2013, Supplemental Decl. of Collette McDonald in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class ("July 8, 2013, McDonald Decl.") ¶ 2.)  According to the Tentative, because "[i]t would be impractical to join [all] 1,098 individuals[,] . . . Plaintiff has satisfied the numerosity requirement."  (June 24, 2013, Tentative at 5.)

### B. Commonality.

The Tentative states that Plaintiff's Motion "fail[ed] to provide evidence in support of a finding regarding . . . common questions."  (June 24, 2013, Tentative at 6.) According to the Tentative, "[t]he only evidence Plaintiff sets forth" is (a) "that the payroll records of 410 of the 1,098 [p]otential Class Members were stamped with a 'NO LUNCH' coding, indicating their meal periods were canceled," and (b) Plaintiff's Declaration stating that "she did not receive meal-period premium pay when her pay records were stamped with a 'NO LUNCH' coding."  (June 24, 2013, Tentative at 6.) Because Plaintiff "[did] not set forth any other evidence to demonstrate a common question," the Tentative states, "[she] has not satisfied the commonality requirement." (June 24, 2013, Tentative at 6.)

As noted above, Plaintiff has alleged that ATS committed six wage-and-hour violations.  The commonality of each is addressed in turn.

### 1. Plaintiff's Meal-Period Claim.

This claim is focused on a very specific subset of meal-period violations, namely, those instances in which ATS's payroll records reflect when an employee has a "NO LUNCH" coding.  Specifically, as alleged in Plaintiff's Complaint, "ATS failed to provide Plaintiff and [a]irport [a]gents with meal-period premium wages for those occasions on which they were not provided with adequate meal breaks . . . despite the fact that it kept track of those instances so that it could reverse the automatic meal-period deduction taken by its payroll system each workday."  (Nov. 2, 2011, Compl. ¶ 8.  See also Nov. 2, 2011, Compl. ¶ 34 (seeking meal-period wages for "[t]hose instances [that]

are recorded in ATS's payroll system").)  According to evidence reviewed in connection with negotiating the Settlement Agreement, ATS required employees to sign a "NO LUNCH" form whenever the nature of the work prohibited an employee from taking a required meal break; a "NO LUNCH" coding was then made in ATS's timekeeping system to reverse the automatic deduction.  (July 8, 2013, Harris Decl. ¶ 5.) Notwithstanding the fact that the "NO LUNCH" form attributed the reason for the missed meal to the nature of the work—as opposed to attributing it to the employee's voluntary decision to work through the meal—ATS *never* paid any meal-period wages for the "NO LUNCH" workdays.  (July 8, 2013, Harris Decl. ¶¶ 5–6.)  "The common questions [thus] include whether ATS's policy of never providing meal-period premium wages for documented inadequate meal breaks violates the California Labor Code's express requirement that wages be provided for missed meal breaks."  (Nov. 2, 2011, Compl. ¶ 26.)

Plaintiff, in other words, is not seeking redress for any and all violations of California's meal-period statute, section 512 of the Labor Code; instead, she is seeking redress *only* for those missed meals for which a "NO LUNCH" form was completed and a corresponding "NO LUNCH" notation was made in the payroll system.  According to ATS's records—records that were reviewed in connection with negotiating the Settlement Agreement—there are a total of 3,701 of these "NO LUNCH" codings across the Settlement Class.  (July 8, 2013, Harris Decl. ¶ 6.)  Although those 3,701 codings were experienced by only 410 Settlement Class members (including Plaintiff herself, for whom there are at least ten such codings), the *policy* to never pay a meal-period wage for any "NO LUNCH" codings applied to *all* 1,098 Settlement Class members.[3]  (July 8, 2013, Harris Decl. ¶ 6.)

The clear failure to pay any meal-period wages for any of these codings satisfies

---

[3] In recognition of the fact that not all Settlement Class members experienced a canceled meal, the Settlement Agreement divides the Net Settlement Payment into two sub-funds, one of which is earmarked exclusively for the 410 "NO LUNCH" employees. (Settlement Agreement § 7.D.)

1    the commonality standard set forth by the U.S. Supreme Court in <u>Wal-Mart Stores, Inc.</u>

2    <u>v. Dukes</u>, 131 S. Ct. 2541 (2011).  In <u>Wal-Mart Stores, Inc.</u>, the Court explained that

3    what matters for purposes of commonality is whether an overriding issue exists that is

4    capable of resolution in a single action for the class as a whole:

> The crux of this case is commonality—the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2).  That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. Rev. 97, 131–132 (2009).  For example:  Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," <u>Falcon</u>, <i>supra</i>, at 157, 102 S. Ct. 2364, 72 L. Ed. 2d 740.  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

18   <u>Wal-Mart Stores, Inc.</u>, 131 S. Ct. at 2551 (internal references omitted).  Heeding <u>Wal-</u>

19   <u>Mart Stores, Inc.</u>, Plaintiff is not seeking to collect class-wide meal-period wages for any

20   and all violations of section 512.  That, of course, would be akin to someone seeking

21   class-wide redress for any and all violations of Title VII.  Instead, Plaintiff is seeking to

22   collect meal-period wages only for those instances in which a "NO LUNCH" form was

23   submitted attributing the missed meal to the nature of the work.  Again, there are a total

24   of 3,701 such "NO LUNCH" instances across the Settlement Class, and it was ATS's

25   policy to <i>never</i> pay meal-period wages for <i>any</i> such instances. (July 8, 2013, Harris

26   Decl. ¶ 6.)  Plaintiff's contention is that the stated reason on the "NO LUNCH" form,

27   together with the fact that meal-period wages were never paid, definitively answers the

28   liability question posed by the California Supreme Court in <u>Brinker Restaurant Corp. v.</u>

1   Superior Court, 53 Cal. 4th 1004, 1040–41 (2012) (explaining that meal-period liability

2   exists if the reason for the missed meal is attributable to the nature of the work, not to the

3   employee's voluntary decision to work through a break).

4          In any event, even if there were no company-wide policy regarding the treatment

5   of "NO LUNCH" codings—indeed, even if Plaintiff's meal-break claim were so

6   amorphous as to seek redress for all manner of section 512 violations—a class-wide issue

7   would exist for all Settlement Class members in light of ATS's alleged preemption

8   defense.  (Dec. 9, 2011, Notice of Removal of Civil Action to U.S. Dist. Court Ex. 3 at

9   ¶ 16.)  Since this case's inception, and particularly during the private mediation engaged

10  in by the parties, ATS has argued that Plaintiff's meal-break claim is preempted under the

11  Airline Deregulation Act ("ADA").  (July 8, 2013, Harris Decl. ¶ 14.)  Under the ADA,

12  "a state . . . may not enact or enforce a law, rule, regulation, or other provision having the

13  force and effect of law related to a price, route, or service of an air carrier."  49 U.S.C.

14  § 41713(b)(1).  ADA preemption applies to state laws "'having a connection with, or

15  reference to,' carrier 'rates, routes or services' . . . even if [the laws'] effects on rates,

16  routes or services 'is only indirect'" and even if the laws are "'consistent' . . . with federal

17  regulation[s]."  Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 370 (2008) (quoting

18  Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 386–87 (1992)).  In this regard,

19  ATS's counsel have repeatedly stressed to putative Class Counsel that compliance with

20  Labor Code section 512 would require ATS to regularly relieve employees of their duties

21  so that they can take uninterrupted, thirty-minute meal breaks.  (July 8, 2013, Harris

22  Decl. ¶ 14.)  Because this would have an obvious effect on the scheduling of flights,

23  ATS's argument goes, California's meal-break statute is preempted by the ADA.  (July 8,

24  2013, Harris Decl. ¶ 14.)

25         The Northern District of California, in fact, has recently held as much in a putative

26  class action brought on behalf of airport agents:  Angeles v. U.S. Airways, Inc., 2013 WL

27  622032 (N.D. Cal. filed Feb. 19, 2013).  As explained in Angeles, "[i]t is easy to imagine

28  a situation in which an [agent] must, by law, be relieved of duty, but doing so would

1    prevent an aircraft from being fueled or serviced, or cargo from being unloaded such that

2    it would impact the schedule of the point-to-point transportation of passengers or cargo."

3    <u>Angeles</u>, 2013 WL 622032 at *9.  According to <u>Angeles</u>, although "state laws and

4    regulations [concerning meal breaks] do not directly regulate [an air carrier's] rates,

5    routes or services, preemption . . . appl[ies] even if the state law[s'] impact is indirect."

6    <u>Id.</u>  The court therefore dismissed the plaintiffs' meal-period claims with prejudice.  <u>Id.</u>

7        Other courts have reached a similar conclusion.  In <u>Blackwell v. SkyWest Airlines,</u>

8    <u>Inc.</u>, 2008 WL 5103195 (S.D. Cal. filed Dec. 3, 2008), for instance, the Southern District

9    held that an airport agent's class-wide meal-break claims were preempted under the ADA

10   because they necessarily had an impact on air-carrier service.  According to <u>Blackwell</u>,

11   "requiring [airline employers] to provide [a]gents [with] meal . . . periods could result in

12   cascading flight delays, increased risk of death or serious injury to passengers and

13   damage to aircraft, and security breaches." <u>Blackwell</u>, 2008 WL 5103195 at *17.

14   Moreover, because requiring compliance with California's meal-break statute would

15   increase labor costs (by necessitating either the payment of meal-period premium wages

16   or the hiring or additional staff), airfare would ultimately increase, which would have

17   "the 'forbidden significant effect' on air carriers' . . . prices[] and routes that the ADA

18   seeks to avoid." <u>Id.</u> at *18.  Preemption therefore applies.  <u>Id.</u>

19       The preemption defense, of course, is a defense that is common to all Settlement

20   Class members, and this in and of itself creates commonality.  "Where a central common

21   defense may bar each of plaintiffs' claims, class action treatment is particularly apt" . . .

22   because, '[i]f the defense succeeds, the entire litigation is disposed of[, and, i]f it fails, it

23   will not be an issue in the subsequent individual trials.'" <u>Romero v. Producers Dairy</u>

24   <u>Foods, Inc.</u>, 235 F.R.D. 474, 490 (E.D. Cal. filed Apr. 19, 2006) (quoting <u>In re "Agent</u>

25   <u>Orange" Prod. Liability Litig.</u>, 818 F.2d 145, 167 (2d Cir. 1987)).  In <u>Romero</u>, several

26   plaintiffs who had brought wage-and-hour claims against their employer sought class

27   certification under Rule 23.  <u>Id.</u> at 481.  The employer sought to defend against the claims

28   on the ground that claims of the putative class were barred by a specific regulatory

exemption applicable to all class members.  <u>Id.</u> at 486.  As explained by the court, the "[d]efendant contends, in essence, that a legal question exists[,] the resolution of which potentially precludes the claims of the entire class."  <u>Id.</u>  "This issue alone," the court held, "is sufficient to satisfy the commonality requirement."  <u>Id.</u>  Indeed, "[r]egardless of the extent of the other individual issues, this issue alone appears to dominate in importance."  <u>Id.</u> at 490.  Similarly, the preemption defense, which ATS will seek to apply across the board to all employees, is itself a common issue that justifies certification under Rule 23.  Either preemption applies or it doesn't, and there is no reason to adjudicate the issue over and over again in separate proceedings just to get the same answer.  Commonality therefore exists for Plaintiff's meal-break claim irrespective of ATS's above-described "NO LUNCH" policy.

## 2. *Plaintiff's Expense-Reimbursement Claim.*

In addition to the meal-break claim, Plaintiff's Complaint alleges that ATS failed to reimburse its employees for the costs of maintaining their uniforms, in violation of section 2802 of the Labor Code.  (Nov. 2, 2011, Compl. ¶¶ 11–12, 40–41.)  Section 2802 requires an employer to "indemnify his or her employee[s] for all necessary expenditures or losses incurred by the employee[s] in direct consequence of the discharge of [their] duties."  Cal. Lab. Code § 2802(a).  Under the relevant Industrial Welfare Commission wage order, "[w]hen uniforms are required by employers to be worn by . . . employee[s] as a condition of employment, such uniforms shall be provided *and maintained* by the employer."  8 Cal. Code Regs. § 11090 subsec. 9(A) (emphasis supplied).  Now, according to evidence reviewed in connection with negotiating the Settlement Agreement, *every* Settlement Class member, including Plaintiff, was required to wear an ATS-provided uniform.  (July 8, 2013, Harris Decl. ¶ 11; July 8, 2013, McDonald Decl. ¶ 4.)  Also according to the evidence, although all agents were responsible for cleaning their uniforms, ATS *never* reimbursed them for those cleaning costs and *never* apprised them that they were entitled to request reimbursement for cleaning expenses.  (July 8, 2013, Harris Decl. ¶ 11; July 8, 2013, McDonald Decl. ¶ 4.)  Consistent with this policy,

1    Plaintiff herself was never reimbursed.  (July 8, 2013, McDonald Decl. ¶ 4.)

2          Whether employers cannot shift laundry costs onto their employees is a question

3    common to the Settlement Class.  The Central District has itself held that no such shifting

4    is permitted:

5          Section 9 of Industrial Welfare Commission Wage Order 8 provides
     that "when uniforms are required by the employer to be worn by the
6    employee as a condition of employment, such uniforms shall be provided
     and maintained by the employer."  See also California Dairies, Inc. v. RSUI
7    Indem. Co., 617 F. Supp. 2d 1023, 1044 (E.D. Cal. 2009).  Plaintiffs have
     established that Defendant had a class-wide policy of requiring the putative
8    subclass members to maintain their own uniforms.  Employees were
     required to sign an "Employee Uniform Agreement" prior to being hired,
9    which required that the employee maintain and return the uniform in a clean
     condition or otherwise reimburse Defendant for the cost of cleaning the
10   uniform.  Defendant responds that it has never charged any employee under
     this provision.  *However, this does not speak to Plaintiffs' argument that
11   Defendant failed, as a matter of policy, to provide maintenance for uniforms.*
     There is nothing to suggest a lack of commonality among the putative
12   subclass or that individual issues predominate.

13   Abdullah v. U.S. Security Associates, Inc., 2011 U.S. Dist. LEXIS 156685 at *16–17

14   (C.D. Cal. filed Jan. 11, 2011) (emphasis supplied).[4]

15         Of course, the amount of *damages* suffered by Settlement Class members will vary

16   depending on how—and how often—they laundered their uniforms; however, "the mere

17   fact that there might be differences in damage calculations is not sufficient to defeat class

18   certification."  Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1026 (9th Cir. 2011) (citing

19   Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010)).  What

20   matters for purposes of Rule 23, in other words, is whether *liability* can be determined on

21   a class-wide basis.  Here, because the Labor Code "requires employers to reimburse for

22   uniform expenses *whenever* uniforms are required," Cal. Dairies, Inc., 617 F. Supp. 2d at

23   1045 (emphasis supplied), and because ATS had a policy of *never* reimbursing

24   employees for cleaning costs, liability need be established for the Settlement Class only

25   once.  Commonality therefore exists as to Plaintiff's section 2802 claim, which claim

26   concerns *only* the factual allegation that ATS failed to reimburse employees for uniform-

27   cleaning costs (as opposed to the whole panoply of reimbursable expenses under section

28         [4] No Westlaw citation is available for this case.

2802).

### 3.    *Plaintiff's Improper-Seating Claim.*

Aside from alleging that ATS is liable for canceled, "NO LUNCH" meals and for unreimbursed uniform-cleaning expenses, Plaintiff's Complaint alleges that ATS failed to provide adequate seating for airport agents.  (Nov. 2, 2011, Compl. ¶¶ 14–15.)  As to seating, the relevant Industrial Welfare Commission wage order requires that "[a]ll working employees . . . be provided with suitable seats when the nature of the work reasonably permits the use of seats."  8 Cal. Code Regs. § 11090 subsec. 14(A).

A violation of the wage order's seating requirement is a violation of the Labor Code.  See Cal. Lab. Code § 1198 (stating that "[t]he employment of any employee . . . under conditions of labor prohibited by [a wage] order is unlawful"); Bright v. 99¢ Only Stores, 189 Cal. App. 4th 1472, 1479 (2010) (holding that "section 1198 renders unlawful violations of the suitable seating requirement of [the] wage order").  That said, seating violations do not give rise to a claim for damages; instead, they merely form the basis for a civil-penalty claim under the Private Attorneys General Act ("PAGA"), section 2698 *et seq.* of the Labor Code.  See, e.g., Silva v. U.S. Bancorp, 2011 WL 7096576 at *4 (C.D. Cal. filed Oct. 6, 2011) (holding that "monetary remedies for these violations are only available in the form of penalties under PAGA"); Plaisted v. Dress Barn, Inc., 2013 WL 300913 at *6 (C.D. Cal. filed Jan. 25, 2013) (stating that the plaintiff "continues to stand behind her claim that [the defendant] failed to provide her with reasonable seating in violation of [the wage order]," but holding that, "since she failed to comply with [PAGA] notification requirements, her claim has no legs to stand on").

For this reason, although there are improper-seating allegations, there is no "stand-alone" claim in Plaintiff's Complaint for improper seating.  Whether or not commonality exists as to improper seating is therefore irrelevant for purposes of class certification.  Indeed, even though Plaintiff's seating allegations can form the basis for a PAGA civil-penalty claim—a representative claim that can be brought on behalf of other employees, see Cal. Lab. Code § 2699(a)—commonaltiy is still unnecessary because "a PAGA claim

need not meet class certification requirements," <u>McDonald v. Ricardo's on the Beach,</u>
<u>Inc.</u>, 2013 WL 228334 at *9 (C.D. Cal. filed Jan. 22, 2013).  <u>See</u> <u>also</u> <u>Gallardo v. AT&T</u>
<u>Mobility, LLC</u>, --- F. Supp. 2d ---, 2013 WL 1334007 at *6 (N.D. Cal. filed Mar. 29,
2013) (explaining that a PAGA representative action is a "law enforcement action"
distinct from a class action—a view "shared by the California Supreme Court") (internal
quotations omitted).  In any event, given that many Settlement Class members worked on
airport tarmacs, it would seem to be a common question whether the "nature of the work
reasonably permits the use of seats" in such a potentially dangerous location.  8 Cal.
Code Regs. § 11090 subsec. 14(A).

### 4.    *Plaintiff's Remaining, Derivative Claims.*

Plaintiff's remaining claims are for continuing wages under sections 201 through
203 of the Labor Code, pay-stub damages under section 226 of the Labor Code, and
unfair competition under section 17200 *et seq.* of the California Business and Professions
Code.  Each of these claims is *entirely* derivative of the above-described meal-period and
reimbursement claims, meaning that, if the underlying claim fails, the derivative claims
necessarily also fail.  Accordingly, the very same common issues detailed above pertain
to Plaintiff's remaining claims.

For instance, Labor Code sections 201 and 202 require that former employees be
timely paid all wages due and owing upon the termination of their employment.  <u>See</u> Cal.
Lab. Code §§ 201(a), 202(a).  An employer who violates section 201 or 202, whichever
the case may be, owes his or her aggrieved employees an additional day's worth of wages
for each day of non-payment, up to a maximum of thirty days.  <u>Id.</u> § 203(a).  The
employees' wages, in other words, "continue" to accrue for up to thirty days.  Plaintiff
contends that Settlement Class members who are no longer employed by ATS—
including Plaintiff herself, whose employment ended in mid-2011 (July 8, 2013,
McDonald Decl. ¶ 2)—and who were denied meal-period wages on days reflecting "NO
LUNCH" codings are entitled to these continuing wages.  (Nov. 2, 2011, Compl. ¶¶ 13,
42–44.)  The same goes for all employees who were not provided amounts to cover the

expense of cleaning their uniforms, which is to say, all Settlement Class members who are former employees.  (Nov. 2, 2011, Compl. ¶ 43.)

As alleged, Plaintiff's continuing-wage claim does *not* address any and all violations of sections 201 and 202.  In other words, it does not address the failure to issue a timely final paycheck to former employees (occurring, for example, when an employee is fired but is not given a check on his or her last day of employment).  Instead, Plaintiff's claim is limited to a very specific type of violation:  the failure to include all wages due and owing in the final paycheck.  Of course, whether all due and owing wages were paid depends on the answer to the common meal-period question detailed above, namely, whether ATS is liable in the first place for "NO LUNCH" meal-period wages based on the "admission" that such meals were not missed on account of agents' voluntary choice—a question whose answer itself depends on the related common question of whether California's meal-period requirement is preempted for agents by the ADA.  Similarly, whether all due and owing wages were paid depends on whether ATS was required to provide additional amounts for uniform-cleaning costs—a question whose answer itself depends on the common question of whether such costs are within the scope of section 2802.  The common meal-period and uniform-cleaning questions thus carry over to Plaintiff's derivative continuing-wage claim, satisfying Rule 23.

The same can be said for Plaintiff's pay-stub claim under section 226.  Section 226 requires employers to provide their employees with "accurate itemized statement[s]" accompanying their paychecks, listing, *inter alia*, all gross and net wages earned.  Cal. Lab. Code § 226(a).  If "[a]n employee suffer[s] injury" stemming from a failure to provide such information, he or she is entitled to recover statutory damages of up to $100 for each incorrect pay stub.[5]  Id. § 226(e)(1).  According to Plaintiff's Complaint,

_____

[5] The "injury" prong of section 226 does not create an individualized issue standing in the way of class-wide treatment.  In 2012, section 226 was amended such that employees are "deemed to suffer an injury" if they cannot determine gross or net wages "from the wage statement alone."  Cal. Lab. Code § 226(e)(2)(B).  This is necessarily the case for every Settlement Class member; after all, even if employees know exactly how much in additional meal-period wages they should have been paid, they will not know how much of those gross wages will be deducted for payroll taxes.  Accordingly, injury is

whenever ATS coded a "NO LUNCH" workday for an airport agent, it should have paid a missed-break wage, and that wage should have appeared on the agent's pay stub. (Nov. 2, 2011, Compl. ¶¶ 10, 38.) As with the continuing-wage claim, whether such a wage is owed to employees in the first place depends on the common question of whether ATS is even liable for "NO LUNCH" meal-period wages—a question whose answer, again, also depends on the related common question of whether California's meal-period requirement is preempted by the ADA.

Putting these reappearing common issues to the side, another commonality as to both the derivative continuing-wage claim and the derivative pay-stub claim arises in light of the recent Central District opinion of Jones v. Spherion Staffing LLC, 2012 WL 3264081 (C.D. Cal. filed Aug. 7, 2012). In Jones, a plaintiff brought a putative class-wide suit against her former employer for improper meal breaks. Jones, 2012 WL 3264081 at *1. The plaintiff also alleged claims for improper pay stubs and continuing wages—claims that were "entirely derivative" of her meal-break claim. Id. at *2. As framed by the court, "[t]he issue presented is, therefore, whether failure to pay premiums for meal . . . period violations . . . and the related failure to list such premium pay on employees' wage statements[] is actionable under section 226," as well as whether "an employer's failure to provide meal . . . period premium pay at the time of termination create[s] a violation of sections 201, 202 and 203 for the failure to pay 'wages' due upon termination." Id. According to the court, because a missed-break lawsuit fundamentally asserts a claim that an employer failed to provide proper breaks—not a claim that an employer failed to provide wages, *per se*—employees "cannot advance a claim for

---

"automatic" for the entire Settlement Class, obviating the need for an individualized analysis. It is Plaintiff's contention that the 2012 amendment applies to conduct taking place before the amendment's effective date in 2013. In this regard, the Central District recently interpreted the amendment as a "clarification" of existing law. Escano v. Kindred Healthcare Operating Co., 2013 WL 816146 at *12 (C.D. Cal. filed Mar. 5, 2013). Based on the reasoning of the California Supreme Court with respect to clarifications, the language found in amended section 226 applies to Plaintiff's pay-stub claim. See Carter v. Cal. Dep't of Veterans Affairs, 38 Cal. 4th 914, 923 (2006). In any event, whether the amendment is "retroactive" or "prospective" is a common question that need be decided only once as opposed to multiple times in individual actions. This is another common issue that weighs in further support of class certification.

1  noncompliant wage statements pursuant to section 226(a) or failure to pay wages due

2  upon termination pursuant to section 203 based solely on alleged violations of

3  [California's meal-period law]." Id. at *8. Such a finding turns exclusively on the

4  derivative nature of the claims themselves, not on anything individualized about the type,

5  manner, or extent of work performed by the aggrieved employees. In other words, such a

6  finding arguably precludes the claims of each and every Settlement Class member, across

7  the board, in one stroke. Similar to the ADA defense, this is another common issue

8  militating in favor of class-wide treatment.

9      Finally, Plaintiff turns to her claim for unfair competition under section 17200 *et*

10  *seq.* of the Business and Professions Code. Section 17200 defines "unfair competition"

11  as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code

12  § 17200. In effect, "[a]n action based on this state statute 'borrows' violations of other

13  laws," Harris v. Investors' Business Daily, Inc., 138 Cal. App. 4th 28, 32–33 (2006),

14  meaning that any statutory violation automatically results in a violation section 17200.[6]

15  Plaintiff may properly seek restitution for violations of California's meal-break and

16  expense-reimbursement statutes for herself and all similarly situated employees under the

17  unfair-competition law simultaneously with her claims under the Labor Code. See Cal.

18  Bus. & Prof. Code § 17203 (stating that a "court may make such orders or judgments . . .

19  as may be necessary to restore to any person in interest any money or property, real or

20  personal, which may have been acquired by means of such unfair competition"). This, in

21  fact, is precisely what Plaintiff seeks by way of her section 17200 claim. (See Nov. 2,

22  2011, Compl. ¶¶ 45–46.) Because this claim introduces nothing new to the analysis, the

23  above commonalties apply wholesale, and Rule 23 certification is proper.

24  / / / / /

25

26  [6] In other words, this claim completely overlaps with Plaintiff's underlying meal-period and uniform-maintenance claims. The only reason she has brought this seemingly duplicative cause of action is because it expands her statute of limitations. Compare Cal.

27  Civ. Proc. Code § 338 (adopting a three-year statute for "action[s] upon a liability created by statute) with Cal. Bus. & Prof. Code § 17208 (stating that "[a]ny action to enforce any

28  cause of action pursuant to this chapter shall be commenced within four years").

*C.     Typicality.*

The Court's Tentative recites the proposition that a putative class representative's claims "'need not be substantially identical'" to those of the class he or she seeks to represent, and that "'representative claims are "typical" if they are reasonably co-extensive with those of absent class members.'"  (June 24, 2013, Tentative at 6 (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)).)  According to the Tentative, although Plaintiff had submitted a Declaration in which she explained that she is a former hourly-paid employee of ATS and that she did not receive any meal-period premium pay for any of her "NO LUNCH" workdays, that evidence was insufficient to support a finding of typicality.  (June 24, 2013, Tentative at 7.)  The Court specifically requested that Plaintiff provide "evidence regarding when she worked for Defendant and what position she held," as well as whatever further evidence was necessary to establish typicality under Rule 23.  (June 24, 2013, Tentative at 7.)

Plaintiff is submitting herewith a Supplemental Declaration explaining that she worked for ATS as a customer-service agent from approximately mid-2005 through approximately mid-2011.  (July 8, 2013, McDonald Decl. ¶ 2.)  As a customer-service agent, she was treated as a non-exempt employee.  (See July 8, 2013, McDonald Decl. ¶ 2.)  During her tenure as a customer-service agent, Plaintiff experienced at least ten canceled, "NO LUNCH" meals, for which she submitted ten "NO LUNCH" forms.  (July 8, 2013, McDonald Decl. ¶¶ 2–3.)  She was never paid a missed-break wage for any of those instances.  (July 8, 2013, McDonald Decl. ¶¶ 2–3.)  Also throughout her tenure as a customer-service agent, Plaintiff was required by ATS to wear a uniform, which uniform ATS also directed her to clean and maintain.  (July 8, 2013, McDonald Decl. ¶ 4.)  Further to that directive, Plaintiff regularly laundered her uniform at her own expense; however, she was never provided any reimbursement for those expenses, and she was never told by ATS that she could request any cleaning-cost reimbursement.  (July 8, 2013, McDonald Decl. ¶ 4.)

In light of the common questions detailed above, Plaintiff's Supplemental

Declaration is sufficient to demonstrate her typicality.  The typicality requirement, after

all, "is intended to preclude certification of those cases where the *legal theories* of the

named plaintiffs potentially conflict with those of the absent class members."  Hon.

William W Schwarzer, *et al.*, California Practice Guide:  Federal Civil Procedure Before

Trial ¶ 10:285 (The Rutter Group 2013) (citing Gen. Tel. Co. of the SW v. Falcon, 457

U.S. 147, 156 (1982)) (emphasis supplied).  Accordingly, to the extent that a putative

class representative is a member of the class that he or she seeks to represent, a finding of

commonality will likely result in a finding of typicality.  See Gen. Tel. Co. of the SW,

457 U.S. at 157–58 & n.13 (stating that "[t]he commonality and typicality requirements

of Rule 23(a) tend to merge").  Because Plaintiff is herself a member of the Settlement

Class, and because she was subjected to the same "NO LUNCH" and uniform-cleaning

policies to which all other Settlement Class members were subjected, her theory of

recovery is the same as everyone else's, meaning her claims are "typical."

### D.    Adequacy.

Rule 23's adequacy requirement is divided into two parts.  One part considers the

adequacy of putative class counsel, and the other considers the adequacy of the putative

class representative.  The Court's Tentative finds that "Plaintiff has demonstrated [her

C]ounsel's 'ability to fairly and adequately represent the interests of the [C]lass.'"[7]  (June

24, 2013, Tentative at 9.)  The Tentative, however, also states that, "because of the

---

[7] Under the Settlement Agreement, the Parties have agreed to the appointment of Alan
Harris and David Zelenski of Harris & Ruble, and John P. Dorigan of the Law Offices of
John P. Dorigan, as Class Counsel.  (Settlement Agreement § 6.)  The Court's Tentative
concluded that the adequacy of Class Counsel had been established on the basis of
evidence about Mssrs. Harris and Zelenski's extensive experience litigating class actions.
(June 24, 2013, Tentative at 9.)  The Tentative did not rule on Mr. Dorigan's adequacy
because no evidence had been submitted as to his qualifications.  (June 24, 2013,
Tentative at 9.)  Plaintiff is filing herewith a Declaration executed by Mr. Dorigan
outlining his experience.  Although Mr. Dorigan has relatively little experience litigating
class actions, he has been practicing law for more than thirty years in both state and
federal court.  (July 8, 2013, Decl. of John P. Dorigan in Supp. of Mot. for Preliminary
Approval of Class-Action Settlement & Conditional Certification of Settlement Class
¶ 2.)  His years of practice, coupled with his association with Harris & Ruble, are
sufficient to qualify him under Rule 23.  See, e.g., Davis v. Astrue, 250 F.R.D. 476, 491
(N.D. Cal. 2008) (explaining that an attorney with limited class-action or federal
experience "can provide adequate representation" if he or she "associates [with] an
experienced federal class-action attorney").

1   significantly large incentive payment [contemplated by the Settlement Agreement], . . .

2   Plaintiff has not demonstrated that she can fairly and adequately represent the proposed

3   [C]lass."  (June 24, 2013, Tentative at 8.)

4        The Court's Tentative is expressly predicated on the Ninth Circuit's recent holding

5   in Radcliffe v. Experian Information Solutions, Inc., 715 F.3d 1157 (9th Cir. filed as

6   amended May 2, 2013).  In Radcliffe, the Ninth Circuit reversed an order approving a

7   class-wide settlement concerning alleged improper credit reports.  Radcliffe, 715 F.3d at

8   1161.  The settlement would have provided payments to about 15,000 class members of

9   $150, $500, or $750; an additional 755,000 class members would receive payments of

10  $26.  Id. at 1162.  At the final-approval stage, several objectors challenged the settlement,

11  arguing that a provision in the settlement agreement permitting an incentive-award

12  application of $5,000 to be made only on behalf of those named plaintiffs who supported

13  the settlement created a conflict.  Id.  The Ninth Circuit agreed.  Id. at 1167.

14       In rejecting the settlement, the Radcliffe court explained that, unlike most class-

15  wide settlements that allow requests for named-plaintiff enhancements, this one

16  "explicitly condition[ed the] incentive awards to [the] named representatives on their

17  support for the settlement."  Id. at 1165–66.  The court, in other words, was "not

18  confronted with [a] run-of-the-mill incentive award[], but rather a settlement provision

19  that weigh[ed] on the class representatives' independent judgment on whether to support

20  the settlement by calling for the denial of incentive awards if they d[id] not support it."

21  Id. at 1166.  The problem was "further exacerbated" by the fact that the overwhelming

22  majority of class members—755,000 out of a possible 770,000—would receive only $26,

23  i.e., over 190 times less than what the named plaintiffs stood to receive through their

24  incentive awards.  Id. at 1165.

25       Although the Settlement Agreement herein allows for Class Counsel to request an

26  incentive award for Plaintiff McDonald of $5,000, that award does not suffer from the

27  infirmities hobbling the one in Radcliffe.  Unlike the situation in Radcliffe, the

28  Settlement Agreement does not condition the award on Plaintiff's support of the

settlement, expressly or otherwise.  In fact, the Settlement Agreement itself specifically explains that any award is "[s]ubject to approval by the Court."  (Settlement Agreement § 7.C.)  Also, while counsel in <u>Radcliffe</u> told one of the named plaintiff "that he would 'not be entitled to anything' and that he would 'jeopardize the $5,000 [he] would receive [under the settlement]' if he did not support the settlement," as well as "told other plaintiffs that they 'don't see a way for people who don't support the settlement to receive an incentive award,'" <u>Radcliffe</u>, 715 F.3d at 1164–65 (brackets in original), Class Counsel herein have said nothing of the sort to Plaintiff McDonald.  This is reflected in Plaintiff's original Declaration in support of preliminary approval, in which she stated that she understood that any amounts awarded to her would have to be approved by the Court and that she owed a duty of good faith to the Settlement Class (<u>see</u> May 23, 2013, Decl. of Collette McDonald in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class ¶¶ 5, 7), and it is reinforced in the Supplemental Declaration submitted herewith, in which she declares that she would continue to support the present settlement even if the Court were not to award her any incentive award whatsoever (<u>see</u> July 8, 2013, McDonald Decl. ¶ 7).

Furthermore, the relative size of Plaintiff's requested incentive award—compared to the average total award under the Settlement Agreement—is nowhere near the relative size of the award in <u>Radcliffe</u>.  Although both awards are nominally for $5,000, the one in <u>Radcliffe</u> was nearly 200 times as large as the payment to 98% of the class.  In the within action, however, where participating Settlement Class members will likely receive between $300 to $700, the requested incentive payment for Plaintiff is literally an entire order of magnitude smaller than the one in <u>Radcliffe</u>.[8]  This additional payment is justified by the hours Plaintiff has spent assisting her counsel in the litigation of this

---

[8] Plaintiff's Motion posited several estimates as to the likely average recovery for participating Settlement Class members.  Assuming a 50% participation rate, the average recovery is $362.12; assuming a 25% participation rate, the average recovery is $721.69.  (May 23, 2013, Mem. of P. & A. in Supp. of Mot. for Preliminary Approval & Conditional Certification of Settlement Class at ("May 23, 2013, Mot. for Preliminary Approval") 10:24–11:4.)

case—including the time she spent participating in the private mediation session, during which a short-form settlement agreement was executed—and the fact that, had she lost, she would "have been personally responsible for any costs in favor of [ATS]." <u>Vasquez v. Coast Valley Roofing, Inc.</u>, 266 F.R.D. 482, 491 (E.D. Cal. 2010) (wage-and-hour action). Despite this risk, Plaintiff decided to press on to vindicate what she perceived to be improper employment practices—practices that no longer affected her, given her status as a former ATS employee. Because "current employees may very well be reluctant to sue [their employer] out of fear that they will suffer retaliation in some form or other," <u>O'Donnell v. TD Ameritrade, Inc.</u>, 2008 WL 8976220 at *4 (S.D. Cal. filed June 17, 2008), Plaintiff's decision to litigate on behalf of others should be considered as a factor in determining whether to grant the enhancement request.

### E.    Predominance.

In the Tentative, the Court stated that it could not rule on predominance because "Plaintiff ha[d] not established that commonality exists." (June 24, 2013, Tentative at 10.) The exhaustive analysis above regarding each of Plaintiff's claims—her "NO LUNCH" meal-period claim, her uniform-cleaning claim, and her derivative claims for continuing wages, improper pay stubs, and unfair competition—demonstrates not only that there are numerous common issues, but that those common issues predominate over any individualized inquiries. Again, the common questions involve (a) whether ATS's policy of never paying meal-period wages when the nature of the work prohibits the taking of a meal break is a violation of <u>Brinker Restaurant Corp.</u>; (b) whether meal-break claims alleged against ATS, an airline-industry employer, are preempted under the ADA; (c) whether ATS's policy of never reimbursing employees for uniform-cleaning costs and never apprising agents that they were entitled to request reimbursement is a violation of California's expense-reimbursement statute; (d) whether the recent amendment to California's pay-stub statute applies retroactively; and (e) whether the reasoning in <u>Jones</u> precludes any derivative continuing-wage or pay-stub liability for underlying meal-period violations.

These common questions predominate over any individualized issues. For instance, if the answer to question (a) is "no," or if the answer to question (b) is yes, then all of Plaintiff's meal-period-based claims for each and every Settlement Class member disappear in one fell swoop. On the other hand, if the answer to question (a) is "yes" and the answer to question (b) is "no," then ATS is liable for the 3,701 instances of "NO LUNCH" codings. The only remaining issue would be the computation of damages, which would simply be the number of "NO LUNCH" workdays multiplied by the employees' respective hourly wage rates. See Cal. Lab. Code § 226.7(b) (stating that, for meal-period violations, "the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal . . . period is not provided"). Granted, this computation "is invariably an individual question[, but it] does not defeat class action treatment"—particularly given how straightforward the computation is. Yokoyama, 594 F.3d at 1094.

Likewise, if the answer to question (c) is "no," then all of Plaintiff's uniform-maintenance claims for each and every Settlement Class member disappear. On the other hand, if the answer to question (c) is "yes," then the only remaining questions concern the extent of damages, which, again, does not stand in the way of certification. Similarly, if the answer to question (d) is "yes" and the answer to question (e) is "no," then the only remaining issue for purposes of pay-stub liability is the computation of damages under section 226—a relatively simple process, given that damage amounts are set by statute. See Cal. Lab. Code § 226(e). Common issues therefore predominate.

## III.    *The Proposed Settlement Is Fair, Reasonable, and Adequate.*

Although the Tentative denied preliminary approval on the basis that class certification had not been adequately demonstrated, it proceeded to evaluate the Settlement Agreement's fairness and adequacy. (June 24, 2013, Tentative at 10.) The following section of this Memorandum addresses each of the Court's points in turn.

### A.    *Non-Collusive Negotiations.*

The Tentative states that "[t]he [p]roposed Settlement Agreement appears to be the

1 | product of arm's length, informed, and non-collusive negotiations, and the Court finds

2 | this factor weighs in favor of approval." (June 24, 2013, Tentative at 12.)

3 | **B.      Strength of Plaintiff's Case.**

4 | In evaluating the strength of Plaintiff's case, the Court considered the above-

5 | described preemption issue, the notion that meal-period liability may very-well not lead

6 | to derivative liability for pay-stub and continuing-wage claims, and the fact that proper

7 | seating may very-well be an impossibility for this particular employer. (June 24, 2013,

8 | Tentative at 12–13.) "In light of these defenses, and in consideration of the weaknesses

9 | in Plaintiff's case, a $250,000 Gross Settlement Payment appears to be reasonable."

10 | (June 24, 2013, Tentative at 13.)

11 | **C.      Risk, Exposure, Complexity, and Likely Duration of Further Litigation.**

12 | Given the weaknesses with Plaintiff's case, the Court noted that there is

13 | considerable "risk that she will not succeed on the merits of her claims" and that, even if

14 | she does prevail, Settlement Class members "risk recovering less than the settlement"

15 | provides. (June 24, 2013, Tentative at 13.) "Additionally, to litigate this action to its

16 | conclusion likely would be expensive and time consuming." (June 24, 2013, Tentative at

17 | 13.) For these reasons, the Tentative held that "this factor weigh[]s in favor of the

18 | proposed settlement." (June 24, 2013, Tentative at 13.)

19 | **D.      Risk of Maintaining Class-Action Status Throughout Trial.**

20 | The Tentative states that "[t]here is a risk that Plaintiff's claims may be decertified

21 | before trial" and that "[t]his factor [therefore] weighs in favor of the proposed

22 | settlement." (June 24, 2013, Tentative at 13.)

23 | **E.      Amount Offered in Settlement.**

24 | The Settlement Agreement provides for a $250,000 Gross Settlement Payment.

25 | (Settlement Agreement § 7.) After deducting fees and costs, as well as the proposed

26 | incentive award, the remainder (the "Net Settlement Fund") will be distributed to

27 | Settlement Class members who submit valid and timely claim forms. (Settlement

28 | Agreement § 7.D.) One third of the Net Settlement Fund will be distributed *pro rata* to

1   participating Settlement Class members based on the relative number of their respective

2   "NO LUNCH" meals, and two-thirds will be distributed evenly among all participating

3   Settlement Class members.  (Settlement Agreement § 7.D.)

4        If the Court approves attorney's fees of $82,500, litigation expenses of $15,000,

5   claims-administration expenses of $20,000, and a $5,000 incentive award, a total of

6   $127,500 will remain for distribution.  As explained in Plaintiff's moving papers,

7   assuming a relatively high participation rate of 50%, the average settlement payment for

8   canceled-meal claims is $207.29, and the average settlement payment for Plaintiff's non-

9   meal claims is $154.83; assuming a reasonable participation rate of 25%, the average

10  settlement payments increase to $412.58 and $309.11, respectively.  (May 23, 2013, Mot.

11  for Preliminary Approval at 10:24–11:4.)

12       These estimates favorably compare to the total amount of outstanding damages in

13  this case.  First, because the average hourly wage for the 410 Settlement Class members

14  who experienced canceled meals is $12.47, and because each such member experienced

15  an average of 9 "NO LUNCH" meals, average *per capita* damages for missed meals are

16  only $112.23—nearly $100 to $300 *less* than what participating Settlement Class

17  members will likely receive from the canceled-meal portion of the settlement.[9]  (July 8,

18  2013, Harris Decl. ¶¶ 7–10, 13.)  As for Plaintiff's other underlying substantive claim—

19  the uniform-cleaning claim—ATS never expressly required that its employees

20  professionally clean their uniforms, meaning that agents simply needed to machine-wash

21  the uniforms with their non-work apparel rather than shouldering the more expensive

22  alternative of dry cleaning.  (July 8, 2013, Harris Decl. ¶¶ 11–12; July 8, 2013,

23  McDonald Decl. ¶ 4.)  That they will likely recover between $154.83 to $309.11 for these

24  expenses is more than reasonable.  (July 8, 2013, Harris Decl. ¶¶ 12–13.)

25   ──────────────
        [9] As explained in Plaintiff's moving papers, based on an analysis of Defendant's
26  records, total damages for "NO LUNCH" meals for all 410 Settlement Class members
    amount to $46,151.47.  (May 23, 2013, Mot. for Preliminary Approval at 11:12–13.)
27  Because this is only $3,655.72 more than that portion of the Net Settlement Fund
    allocated for canceled meals (see May 23, 2013, Mot. for Preliminary Approval at 10:4–
28  5), the settlement will pay everyone nearly in full for all "NO LUNCH" meals even if all
    of the 410 Settlement Class members submit claims.

1    All told, then, under the settlement, the estimated recoveries exceed the actual

2    damages incurred by Settlement Class members.  Although participating members will be

3    settling their derivative claims for pay-stub violations and continuing wages stemming

4    from the underlying "NO LUNCH" and uniform-cleaning claims, the excess that

5    Settlement Class members will receive is adequate consideration for those penalty

6    amounts—particularly in light of the fact that, under Jones, such amounts cannot be

7    based on Plaintiff's meal-period allegations.  In light of the substantial risk associated

8    with Plaintiff's derivative claims, a significant risk discount applies to those claims.

9        **F.    Extent of Discovery.**

10    In evaluating the meal-period-based claims—including the extent of meal-period

11    damages, pay-stub damages, and continuing-wage damages—Class Counsel were

12    provided with data indicating the precise number of "NO LUNCH" meals experienced by

13    the Settlement Class.  (July 8, 2013, Harris Decl. ¶ 6.)  Class Counsel also reviewed

14    ATS's "NO LUNCH" forms and conducted interviews of various Settlement Class

15    members in order to verify Plaintiff's allegation that meal-period wages were never

16    provided for the 3,701 instances of canceled meals.  (July 8, 2013, Harris Decl. ¶ 5.)  The

17    allegation was confirmed by ATS itself during the settlement-negotiation process, as ATS

18    was extremely forthcoming in terms of explaining its "NO LUNCH" policies.  (July 8,

19    2013, Harris Decl. ¶ 6.)

20    In evaluating the uniform-cleaning claim, Class Counsel had occasion to

21    personally examine airport agents' uniforms.  (July 8, 2013, Harris Decl. ¶ 12.)  Class

22    Counsel also conducted interviews of Settlement Class members, who explained that

23    there was no requirement from ATS that their uniforms be dry-cleaned.  (July 8, 2013,

24    Harris Decl. ¶ 12.)  In addition, Class Counsel weighed evidence from ATS indicating

25    that, in lieu of cleaning their uniforms, agents could simply request new garments from

26    ATS.  (July 8, 2013, Harris Decl. ¶ 12.)

27    Finally, as to the seating allegations, ATS provided photographic evidence to Class

28    Counsel documenting the locations in which it presently provides employee seating.

(July 8, 2013, Harris Decl. ¶ 15.)

### G.    Experience and Views of Counsel.

The Tentative states that "Plaintiff has demonstrated sufficiently [C]ounsel's experience" and that "[t]his factor weighs in favor of approval." (June 24, 2013, Tentative at 14.)

### H.    Reaction of the Settlement Class.

The Tentative notes that, because the reaction of Settlement Class members cannot be gauged until notice is delivered, "this factor is neutral as to the proposed settlement." (June 24, 2013, Tentative at 15.)

## IV.    Attorney's Fees.

The Settlement Agreement permits Class Counsel to seek attorney's fees of up to $82,500, payable from the $250,000 Gross Settlement Payment. (See Settlement Agreement § 7.A.)  Because the within settlement is a common-fund settlement, principles of equity permit the fees to come from the Gross Settlement Payment. E.g., Boeing Co. v. Van Germet, 444 U.S. 472, 478 (1980).  According to the Tentative, the $82,500 fee request amounts to 33% of the common fund, "which exceeds the 25 percent benchmark for common fund cases." (June 24, 2013, Tentative at 16.)  The Tentative then states that, because departures from the lodestar must be judged relative to counsel's lodestar, and because Class Counsel herein "provided no information to determine the lodestar calculation," the Court could not evaluate Class Counsel's request. (June 24, 2013, Tentative Rule at 16.)

In response, Plaintiff notes that the pending Motion is one for preliminary approval, not for attorney's fees, and that all required evidence and argument concerning the propriety of a 33% fee award will be made in due course in a subsequent motion for fees.  That said, Plaintiff is submitting herewith records of her attorneys' time spent litigating this action.  According to those records, Class Counsel have expended 307.70 hours working on this case. (July 8, 2013, Harris Decl. ¶ 23.)  Based on Class Counsel's discounted hourly rates, their lodestar is $127,358.25. (July 8, 2013, Harris Decl. ¶ 23.)

Because an upward departure from the benchmark is justified when the lodestar significantly exceeds the benchmark level of fees, see, e.g., Hopkins v. Stryker Sales Corp., 2013 WL 496358 at *3 (N.D. Cal. filed Feb. 6, 2013), the Settlement Agreement's allowance for a 33% fee request is reasonable.  This is particularly true in light of the fact that Settlement Class members stand to receive over 100% of their meal-period damages even if 33% in fees is awarded, see, e.g., Singer v. Becton Dickinson & Co., 2010 WL 2196104 at *8–9 (S.D. Cal. filed June 1, 2010), and because, in the Central District, *most* comparably sized settlements *exceed* the 25% benchmark, see, e.g., Cicero v. DirecTV, Inc., 2010 WL 2991486 at *6 (C.D. Cal. filed July 27, 2010).  In any event, the Settlement Class will be given an opportunity to object to Class Counsel's fees, and the Court will have an opportunity to properly address the fee request after Class Counsel have filed the appropriate motion.

## V.    *Notice and Administrative Procedures.*

The Tentative holds that, apart from a "concern regarding the [c]laim [f]orm, the Court finds the notice and administrative procedures adequate." (June 24, 2013, Tentative at 19.)  The Court's concern with the proposed claim form was that, although it provided instructions as to how to request exclusion, no separate opt-out form was attached.  (June 24, 2013, Tentative at 18.)  Plaintiff is submitting herewith a revised claim form that includes a separate exclusion-request form.[10]

## VI.    *Conclusion.*

For the foregoing reasons, together with the reasons specified in the original moving papers, the Court should grant preliminary approval of the settlement.


Dated:  July 8, 2013                                      HARRIS & RUBLE

                                                          ___/s/ *David Zelenski*___
                                                          Alan Harris, David Zelenski
                                                          *Attorneys for Plaintiff*

---

[10] A copy of the revised claim form is attached as Exhibit 8 to the Declaration of Alan Harris filed herewith.