Alan Harris (SBN 146079)
David Zelenski (SBN 231768)
HARRIS & RUBLE
6424 Santa Monica Boulevard
Los Angeles, California 90038
Telephone: (323) 962-3777
Facsimile: (323) 962-3004
aharris@harrisandruble.com
dzelenski@harrisandruble.com

John P. Dorigan (SBN 98964)
LAW OFFICES OF JOHN P. DORIGAN
78-560 Via Bolero
La Quinta, California 92253
Telephone: (760) 564-3804
Facsimile: (760) 564-3807
jpdorigan@aol.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COLLETTE McDONALD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AIRPORT TERMINAL SERVICES, INC., and DOES 1–100, inclusive,<br><br>Defendants. | Case No. EDCV 11-01946 VAP (SPx)<br><br>**SUPPLEMENTAL DECLARATION OF ALAN HARRIS IN SUPPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT AND CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS**<br><br>*Assigned to Hon. Virginia A. Phillips*<br><br>Hearing Held: June 24, 2013<br>Time: 2:00 p.m.<br>Courtroom: 2 |

1

SUPPLEMENTAL DECL. OF ALAN HARRIS IN SUPP. OF MOT. FOR PRELIMINARY APPROVAL, *ET AL.*

**ALAN HARRIS** declares under penalty of perjury of the laws of the United States and the State of California as follows:

1. I am a member in good standing of the State Bar of California and am one of the attorneys for Plaintiff Collette McDonald in the within action. I make this Supplemental Declaration in response to the Court's June 24, 2013, Tentative Ruling denying Plaintiff's Motion for preliminary approval of the class-wide settlement reached in this action. A true and correct copy of the Settlement Agreement and General Release ("Settlement Agreement") is attached hereto as **Exhibit 1**,[1] and a true and correct copy of the Tentative Ruling is attached hereto as **Exhibit 2**. If sworn as a witness, I could competently testify to each and every fact set forth herein from my own personal knowledge, and I aver that all of the documents appended to this Declaration have been maintained in my office in the ordinary course of business under my direction and control.

2. The Tentative Ruling states that Plaintiff's Motion did not provide sufficient evidence to support of a finding of commonality; that the Court could not determine whether the settlement amount called for by the Settlement Agreement was sufficient in light of the claims alleged; that, because evidence had not been submitted as to Class Counsel's lodestar, the Court could not determine whether the Settlement Agreement's attorney-fee provision was reasonable; and that the proposed Class Notice should be modified to include a physical opt-out form. This Declaration addresses these points.

### *Commonality and the Reasonableness of the Settlement Amount*

3. As detailed in the concurrently filed Supplemental Memorandum of Points and Authorities in support of preliminary settlement approval, Plaintiff's November 2, 2011, Complaint alleges putative class-wide claims against Defendant Airport Terminal Services, Inc. ("ATS") for (a) the failure to pay meal-period wages for documented missed meal breaks, (b) the failure to reimburse for uniform-maintenance expenses, and

---

[1] Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Settlement Agreement.

(c) the failure to provide adequate workplace seating.  The Complaint also alleges claims for (d) "continuing wages" and (e) pay-stub damages that are derivative of the failures to provide meal-period compensation and uniform-maintenance reimbursement.  The Settlement Agreement seeks to resolve these claims on behalf of all non-exempt individuals employed by ATS in California since November 2, 2007.  The Settlement Agreement was the result of a private mediation before Lynn Frank of Frank and Feder— a mediator well-versed in wage-and-hour actions, including those brought in the airline industry.

      4.    ***The Settlement Class***.  According to data provided to my office by ATS in connection with negotiating the terms of the Settlement Agreement, there are approximately 1,098 individuals who have been employed by ATS as non-exempt employees since November 2, 2007.  Also according to data provided to my office by ATS, each of these individuals was employed by ATS as an "airport agent."

      5.    ***Plaintiff's Underlying Meal-Period Claim***.  As alleged in the Complaint, Plaintiff's missed-meal claim is limited to those situations in which ATS's payroll records reflect that airport agents had a "NO LUNCH" coding on their time sheets.  Because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing meal-break claims that stem from the "NO LUNCH" allegations.  Based on my discussions with Plaintiff, on a review of her time sheets, on my interviews with various airport agents employed by ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process, ATS's timekeeping system would automatically deduct a meal break each workday for all agents.  Accordingly, when an agent could not take a meal break, ATS would have to go into its timekeeping system to reverse the automatic deduction so that the current number of hours worked by agents were reflected therein.  If the missed break was attributable to the nature of the work—*i.e.*, if the agent was simply too busy to take a break on a particular day—the agent was required to submit a "NO LUNCH" form to ATS so

attesting. I have reviewed these "NO LUNCH" forms, and they clearly state at the top that, "[g]iven the nature of the work at ATS, there are times when an employee may not be able to take a lunch period." A true and correct, redacted copy of one such "NO LUNCH" form is attached hereto as **Exhibit 3**.

6. With respect to each instance when a "NO LUNCH" form was submitted, ATS marked the relevant agent's time records with a "NO LUNCH" notation. During the settlement-negotiation process, ATS provided data indicating that, since November 2, 2011, there were a total of 3,701 such "NO LUNCH" codings. These 3,701 "NO LUNCH" codings were experienced by 410 Settlement Class members. According to Plaintiff, she herself experienced at least ten such codings since November 2011. (July 8, 2013, Supplemental Decl. of Collette McDonald in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class ("July 8, 2013, McDonald Decl.") ¶ 2.) Based on my discussions with Plaintiff, on a review of her pay records, and on my interviews with various airport agents employed by ATS since November 2007, ATS *never* paid the meal-period "premium" wage specified by California Labor Code section 226.7 for any of these "NO LUNCH" workdays. ATS itself has been extremely forthcoming in terms of explaining its "NO LUNCH" policies and confirmed during settlement negotiations that it never pays meal-period wages for these codings. Again, this was ATS's policy notwithstanding the fact that the "NO LUNCH" forms attribute the reason for the missed meals to the nature of the work at ATS.

7. In connection with negotiating the Settlement Agreement, ATS provided my office with data indicating that the average hourly wage for Settlement Class members was $12.47. Accordingly, total meal-period damages for Plaintiff's "NO LUNCH" claim are estimated to be $46,151.47 (= 3,701 "NO LUNCH" workdays × $12.47 hourly wage). Assuming an even distribution of the 3,701 "NO LUNCH" codings across the 410 affected agents, each such agent experienced an average of 9 "NO LUNCH" codings. On a *per capita* basis, each of the 410 agents is therefore entitled to approximately $112

(= $12.47 hourly wage × 9 "NO LUNCH" workdays) in meal-period premium pay under section 226.7.

8. Under the Settlement Agreement, ATS has agreed to make a Gross Settlement Payment of $250,000. The Gross Settlement Payment includes amounts for fees, expenses, and a possible incentive payment to Plaintiff; after deducting those amounts, the remaining portion (the "Net Settlement Fund") will be distributed to Settlement Class members who submit valid and timely claim forms. Assuming that the Court approves $82,500 in attorney's fees (equal to 33% of the Gross Settlement Payment), $15,000 in litigation expenses, $20,000 in claims-administration expenses, and a $5,000 incentive award, $127,500 will remain for distribution to participating Settlement Class members. Under the Settlement Agreement, 33.33% of the Net Settlement Fund, or $42,495.75, will be shared by those of the 410 "NO LUNCH" Settlement Class members who submit valid and timely claim forms. In other words, although the Settlement Class consists of 1,098 agents, this 33.33% "sub-fund" will be shared only by the 410 agents who experienced "NO LUNCH" codings. The $42,495.75 sub-fund amount is only $3,655.72 less than the total "NO LUNCH" damages calculated in paragraph 7 above. Accordingly, even if 100% of all 410 Settlement Class members submit valid and timely claim forms, they will be compensated nearly in full, as each will receive, on average, approximately $104 (= $42,495.75 ÷ 410 agents) under the settlement, *i.e.*, only $8 less than the average *per capita* damages calculated in paragraph 7 above.

9. Of course, as explained in Plaintiff's opening moving papers, it is highly unlikely that all Settlement Class members will submit claims. Assuming a more reasonable participation rate of 50%, the average settlement payment for "NO LUNCH" claims doubles to approximately $207 (= $42,495.75 ÷ 205 agents), *i.e.*, nearly $100 more than the average *per capita* damages calculated in paragraph 7 above. Similarly, if the participation rate is 25%, the average settlement payment increases to approximately $412 (= $42,495.75 ÷ 103 agents), *i.e.*, $300 more than the average *per capita* damages

calculated in paragraph 7 above.

10. The estimated recoveries calculated in paragraphs 8 and 9 above are averages. Under the Settlement Agreement, the $42,495.75 portion of the Net Settlement Fund allocated for Plaintiff's "NO LUNCH" claim will be shared by participating Settlement Class members based on the relative number of "NO LUNCH" codings experienced by the members. This ensures that the $42,495.75 will be divided in the most equitable manner possible, with agents who experienced relatively more "NO LUNCH" workdays receiving a larger share than those who experienced relatively fewer "NO LUNCH" workdays. Assuming, then, a 100% participation rate, some Settlement Class members will receive more than $112, and some will receive less than $112; assuming a 50% participation rate, some Settlement Class members will receive more than $207, and some will receive less than $207; and assuming a 25% participation rate, some Settlement Class members will receive more than $412, and some will receive less than $412. The average calculations in paragraphs 8 and 9 above have been provided because, at this stage, it simply cannot be determined which of the 410 "NO LUNCH" agents will submit claim forms.

11. ***Plaintiff's Underlying Uniform-Cleaning Claim***. Plaintiff's expense-reimbursement claim, brought pursuant to Labor Code section 2802, is limited to the allegation that ATS failed to reimburse airport agents for the costs of maintaining their uniforms. As with the meal-break claim, because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing expense-reimbursement claims that stem from the uniform-cleaning allegations. Based on my discussions with Plaintiff, on my interviews with various airport agents employed by ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process, ATS required all of its airport agents to wear work uniforms, including Plaintiff herself. Based again on that same information—particularly on my interviews with numerous airport agents—although these uniforms were provided to agents free of charge, agents

were told that it was their responsibility to keep their uniforms clean. According to airport agents, ATS never explained to them that they could request cleaning-cost reimbursement, and ATS never provided any such reimbursement. Plaintiff herself declares as much in her accompanying Declaration. (July 8, 2013, McDonald Decl. ¶ 4.)

12. Under the Settlement Agreement, in satisfaction of Plaintiff's uniform-cleaning claim, 66.67% of the $127,500 Net Settlement Fund, or $85,004.25, will be distributed on a *pro rata* basis to those of the 1,098 Settlement Class members who submit valid and timely claim forms. Assuming a 100% participation rate, each Settlement Class member will receive approximately $77 (= $85,004.25 ÷ 1,098 agents) in uniform-cleaning reimbursement. Assuming a more reasonable participation rate of 50% or 25%, each participating Settlement Class member will receive approximately $155 or $309, respectively. In my opinion, these amounts are reasonable to compensate employees for the costs of maintaining their uniforms. I have had an opportunity to personally examine agents' uniforms, and, during my investigation, many airport agents explained to me that there was no directive from ATS that their uniforms be dry-cleaned. In addition, during my discussions with various airport agents and with Defendant during the settlement-negotiation process, I was made aware of the fact that, in lieu of cleaning their uniforms, agents could simply request new garments from ATS. These facts minimize the extent of damages attributable to uniform-cleaning costs.

13. ***The Reasonableness of the Estimated Payments***. To recap, based on the above figures, participating Settlement Class members will likely receive between $207 to $412 for their "NO LUNCH" codings (to the extent they experienced any such codings) and between $155 to $309 for uniform-cleaning reimbursement. After extensive discussions with my colleagues, I have formed the opinion that these amounts are reasonable. First, as noted above, the meal-period settlement amounts will provide participating Settlement Class members with *more* than 100% of what is actually owed under section 226.7 of the Labor Code. In addition, because agents' uniforms were not required by ATS to be dry cleaned, the reimbursement portion of the settlement

represents a significant recovery for arguably minimal damages.

14. I note that the Settlement Agreement seeks to resolve derivative claims for improper pay stubs and continuing wages stemming from the two underlying causes of action alleged in the Complaint. As with the underlying claims for missed meals and expense reimbursement, because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing derivative pay-stub and continuing-wage claims that stem from the "NO LUNCH" and uniform-cleaning allegations. Moreover, as explained in Plaintiff's opening moving papers and in the Supplemental Memorandum filed herewith, the Airline Deregulation Act ("ADA") may operate to preempt Plaintiff's meal-period claims. ATS has strenuously advanced the ADA preemption defense since this case's inception and throughout the entirety of the settlement-negotiation process, particularly during the private mediation. According to ATS, compliance with California's meal-period statute would have an immediate effect on the scheduling of flights and an ultimate "pass-through" effect on air fare. If ADA preemption applies, then *none* of the Settlement Class are entitled to *any* meal-period damages, let alone damages stemming from Plaintiff's meal-period-derivative claims. Furthermore, also as discussed in Plaintiff's opening moving papers and in the Supplemental Memorandum filed herewith, even if Plaintiff's underlying meal-period claim is not preempted, recent Central District of California authority holds that derivative claims under sections 203 and 226 cannot be based on violations of California's meal-period statute. The recoveries noted in paragraph 13 above are therefore reasonable in light of the substantial risk discounts that apply in the context of settlement. For instance, consider Plaintiff's pay-stub claim. The pay-stub claim is based on the Labor Code's requirement that wage statements be provided to employees with each paycheck, listing the correct amount of gross and net wages earned. The claim is derivative in the sense that, whenever ATS coded a "NO LUNCH" workday for an airport agent, ATS should have paid a missed-break wage—a wage that should have appeared on the agent's pay stub. Because

Plaintiff's pay-stub claim is wholly derivative of the missed-meal allegations, it is limited to those 410 Settlement Class members who experienced "NO LUNCH" workdays. As noted in paragraph 7 above, each Settlement Class member experienced, on average, a total of nine "NO LUNCH" workdays. Accordingly, on average, each Settlement Class member received, at most, nine separate pay stubs that failed to list additional wages for "NO LUNCH" workdays.[2] Under the Labor Code, total statutory damages for these violations equal $850. See Cal. Lab. Code § 226(e) (specifying damage amounts of $50 for the initially defective pay stub and $100 for each defective pay stub thereafter). As explained in paragraph 13 above, participating Settlement Class members will likely receive between $200 to $400 from that portion of the Net Settlement Fund allocated to address the Complaint's meal-period claim. Because, on average, each Settlement Class member has only $112 in "actual" meal-period damages, the additional $88 to $288 that each Settlement Class member, on average, will likely receive represents between 10% to 33% of total pay-stub damages.

15. ***The Settlement Agreement's Non-Monetary Relief***. In addition to providing the above-described monetary relief, the Settlement Agreement requires ATS to request the installation of additional regulator-permitted seating for its agents at airport worksites. The Settlement Agreement also requires ATS to request the installation of regulator-permitted mats at its airport worksites in order to alleviate the stress of standing when seating is an impossibility. This relief is designed to address Plaintiff's allegations in the Complaint that ATS failed to provide adequate seating at its airport worksites. As explained in Plaintiff's Supplemental Memorandum filed herewith, the seating allegations have been resolved on a non-monetary basis because, under the current state of the law, claims for improper seating do not give rise to claims for damages. Based on my discussions with Plaintiff, on my interviews with various airport agents employed by

---

[2] Of course, it is possible that all "NO LUNCH" workdays experienced by a Settlement Class member occurred over the course of, say, two pay periods, meaning that he or she received only two defective pay stubs, not nine. In other words, nine pay-stub violations occur only if each "NO LUNCH" workday occurred in its own pay period.

ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process—including the provision by ATS of photographic evidence documenting the locations in which it presently does provide employee seating—I have concluded that this non-monetary relief is appropriate.  This is particularly true in light of the fact that, because Plaintiff is a former employee, she lacked standing to obtain such relief after a full trial on the merits of her seating claim.

### *Class Counsel's Lodestar*

16.   Attached hereto as **Exhibit 4** is a true and correct copy of detailed records of the time and expenses incurred by Harris & Ruble in, *inter alia*, initiating the case, litigating the action, preparing for and attending mediation, negotiating the settlement, preparing the settlement-related documents, and attempting to secure preliminary approval of the settlement.  It is my practice and the policy of Harris & Ruble that all employees record their professional time in tenth-of-an-hour increments on a contemporaneous basis, and Exhibit 3 reflects that practice.  In addition, I regularly review the time and expense records of all Harris & Ruble employees, I have reviewed all of the records attached as Exhibit 3, and I believe them to accurately—yet conservatively—represent the time productively and necessarily spent in the prosecution of this case.

17.   Exhibit 3 reflects the following attorney hours and rates:

| *Table 1:  Unadjusted Lodestar* | | | |
|---|---|---|---|
| *Attorney* | *Hourly Rate* | *Hours* | *Lodestar* |
| A. Harris | $800 | 63.40 | $50,720.00 |
| D. Zelenski | $430 | 161.70 | $69,531.00 |
| *Total* | $534.21 | 225.10 | $120,251.00 |

(Ex. 3 at 29.)  Harris & Ruble has filed motions for attorney's fees in common-fund settlements based on these hourly rates, and those motions have been approved by courts in both Los Angeles and San Francisco.

18. ***Class Counsel's Experience***. In support of my hourly rate, I note that I have been and am licensed as an attorney, first in Illinois (1974) and later in California (1989). I am a graduate of the University of Illinois (A.B. 1970, J.D. 1974). After graduation from law school in January 1974, I was hired as a litigation associate at a plaintiffs' antitrust boutique in Chicago, Illinois: Freeman, Freeman & Salzman, P.C.[3] I became a partner in that firm in 1980, and I started my own practice in 1982. I speak before professional organizations on topics of interest to the Bar, and I have represented plaintiffs in complex business litigation for over thirty-six years. See e.g., Illinois v. Ill. Brick Co., Inc., 431 U.S. 720 (1977); In re My Left Hook, LLC, 129 Fed. Appx. 352 (9th Cir. 2005); Gregory v. SCIE, LLC, 317 F.3d 1050 (9th Cir. 2003); In re Blue Coal Corp., 986 F.2d 687 (3d Cir. 1993); In re Blue Coal Corp., 206 B.R. 730 (M.D. Pa. 1997); U.S. v. Gleneagles Inv. Co., Inc., 584 F. Supp. 671, 689 (M.D. Pa. 1984), aff'd. in part and vacated in part, and remanded sub. nom., U.S. v. Tabor Ct. Realty Corp. 803 F.2d 1288 (3d Cir. 1986), cert. den. sub. nom., McClellan Realty Co. v. U.S. 483 U.S. 1005 (1987); In re Uranium Antitrust Litig., 503 F. Supp. 33 (N.D. Ill. 1981); In re Grand Jury, 469 F. Supp. 666 (M.D. Pa. 1980); In re Anthracite Coal Antitrust Litig., 82 F.R.D. 364 (M.D. Pa. 1979), In re Folding Carton Antitrust Litig., 83 F.R.D. 251 (N.D. Ill. 1978); In re Anthracite Coal Antitrust Litig., 78 F.R.D. 709 (M.D. Pa. 1978); In re Masterkey Antitrust Litig., 1977 U.S. Dist. LEXIS 12948 (D. Conn. 1977) (six-week jury trial for plaintiffs); A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp., 68 F.R.D. 383 (N.D. Ill. 1975); In re Cement-Concrete Block, Chicago Area, Grand Jury Proceedings, 381 F. Supp. 1108 (N.D. Ill. 1974); Parmet v. Lapin, 2004 Cal. App. Unpub. LEXIS 5217 (June 1, 2004). I have gone to jury and bench trials on behalf of plaintiffs and, once, a bench trial for a defendant, Allstate Insurance Company. I have

---

[3] Of my still-living partners in Freeman, Freeman & Salzman, a firm that dissolved in 2007, each became a senior partner in a leading national law firm. Lee Freeman, Jr. was a partner and chair of the Antitrust Litigation Practice Group at Jenner & Block from 2007 to June 2011, and he is now of counsel at Katten & Temple LLP. Jerrold Salzman is of counsel at Skadden, Arps, Slate, Meagher & Flom LLP. Tyrone Fahner is a partner at Mayer Brown, having served as its co-chair from 1998 to 2001 and its chair from 2001 to 2007.

represented employees in numerous disputes concerning their receipt of wages, both before the California Division of Labor Standards Enforcement and before state and federal courts.  See, e.g., Jacobs v. CSAA Inter Ins. Bureau, 2009 U.S. Dist. LEXIS 37153 (N.D. Cal. filed May 1, 2009); Escobar v. Whiteside Constr. Corp., 2008 U.S. Dist. LEXIS 68439 (N.D. Cal. 2008) (wage-and-hour collective action); Tremblay v. Chevron Stations, Inc., 2008 Westlaw 2020514 (N.D. Cal. 2008) (wage-and-hour collective action); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 93013 (C.D. Cal. filed July 5, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 139764 (C.D. Cal. filed Sept. 27, 2012) (successful motion to correct improper defense contact of class members in a putative wage-and-hour class action); Covillo v. Specialty's Café, 2012 U.S. Dist. LEXIS 114602 (N.D. Cal. filed Aug. 14, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Perez v. Maid Brigade, Inc., 2007 U.S. Dist. LEXIS 78412 (N.D. Cal. filed Oct. 11, 2007) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Hoffman v. Uncle P Prods., 2008 Cal. App. Unpub. LEXIS 3609; Bithell v. E.P. Mgmt. Servs., LP, 2007 WL 4216854 (Cal. Ct. App. 2007) (sustaining a class-wide settlement as fair and reasonable, and finding that class counsel adequately represented the class); DuPont v. Avalon Hollywood Servs., Inc., 2007 WL 93386 (Cal. App. 2007); Gregory v. Superior Court, 2004 WL 2786357 (Cal. Ct. App. 2004).  In addition, I have been appointed lead class counsel in many wage-and-hour class actions.  See, e.g., Kang v. Albertson's, Inc., C.D. Cal. Case No. CV 07-00894 CAS ($6,637,500 settlement); Tremblay v. Chevron Stations, Inc., N.D. Cal. Case No. CV 07-6009 EDL ($4,500,000 settlement); Doty v. Costco Wholesale Corp., C.D. Cal. Case No. CV 05-3241 FMC ($7,500,000 settlement); Agatep v. Exxon Mobil Corp., C.D. Cal. Case No. CV 05-2342 GAF ($1,500,000 settlement); Alfano v. Int'l Coffee & Tea, LLC, C.D. Cal. Case No. CV 04-8996 SVW; Jenne v. On Stage Audio Corp., C.D. Cal. Case No. CV 04-2045 CAS; Hansen v.

Advanced Tech Sec. Servs., Inc., Los Angeles Sup. Ct. Case No BC 367175 ($1,050,000 settlement); Ross v. Human Res., Inc., Los Angeles Sup. Ct. Case No. BC 351506; Harrington v. Manpay, LLC, Los Angeles Sup. Ct. Case No. BC 312171 ($1,000,000 settlement); Brackett v. Saatchi & Saatchi, Los Angeles Sup. Ct. Case No. BC 298728; Readmond v. Straw Dogs, Inc., Los Angeles Sup. Ct. Case No. BC257394; Greenberg v. EP Mgmt. Servs., LP, Los Angeles Sup. Ct. Case No. BC 237787 ($5,348,000 settlement); Angel Paws, Inc. v. Avalon Payroll Servs., Inc., Los Angeles Superior Court Case No. BC 188982 ($450,000 settlement); Saunders v. Metro Image Group, San Diego Sup. Ct. Case No. GIC 809753; Stratford v. Citicorp West FSB, Monterey Sup. Ct. Case No. M 81026 ($950,000 settlement); Deckard v. Banco Popular N. Am., related to Silva v. Banco Popular N. Am., C.D. Cal. Case No. CV 08-6709 JFW ($1,050,000 settlement).

19. David Zelenski, an attorney at my firm who worked on the above-captioned matter, has worked with me on numerous wage-and-hour matters. See, e.g., Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 93013 (C.D. Cal. filed July 5, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 139764 (C.D. Cal. filed Sept. 27, 2012) (successful motion to correct improper defense contact of class members in a putative wage-and-hour class action); Covillo v. Specialty's Café, 2012 U.S. Dist. LEXIS 114602 (N.D. Cal. filed Aug. 14, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Perez v. Maid Brigade, Inc., 2007 U.S. Dist. LEXIS 78412 (N.D. Cal. filed Oct. 11, 2007) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action). He has also been appointed class counsel in numerous wage-and-hour actions. See e.g., Kang v. Albertson's, Inc., C.D. Cal. Case No. CV 07-00894 CAS ($6,637,500 settlement); Doty v. Costco Wholesale Corp., C.D. Cal. Case No. CV 05-3241 FMC ($7,500,000 settlement); Agatep v. Exxon Mobil Corp., C.D. Cal. Case No. CV 05-2342 GAF ($1,500,000 settlement); Stratford v. Citicorp West FSB, Monterey Sup. Ct. Case No. M 81026 ($950,000

settlement).  Mr. Zelenski is a graduate of Reed College (B.A. 1999) and the University of Southern California (J.D. 2003) (law review).  He is a member of the California Bar (June 28, 2004), and his law-school Note, Talent Agents, Personal Managers, and Their Conflicts in the New Hollywood, 76 S. Cal. L. Rev. 979 (2003), has been cited by the California Supreme Court in Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974 (2008).  In addition, Mr. Zelenski was designated a 2013 "Super Lawyers Rising Star."

20. ***Class Counsel's Hourly Rates.***  Recently, in an effort to bring Harris & Ruble's rates up to date with the current prevailing market rate, I retained the services of an expert in the field, Peter D. Zeughauser, to opine on proper market-based billing rates for class-action cases and to provide me with insight in setting rates for Harris & Ruble's hourly clients.  Mr. Zeughauser has executed a Declaration setting forth his opinion as to the rates for Harris & Ruble's attorneys, including rates for myself and Mr. Zelenski.  A true and correct copy of his Declaration is attached hereto as **Exhibit 5**.  In his Declaration, Mr. Zeughauser notes that, for over seventeen years, he "ha[s] served as a legal management consultant to law firms throughout the United States[ and] . . . ha[s] also consulted with numerous law firms with offices in Los Angeles and throughout the United States regarding the appropriate amount to charge clients for services rendered by the firms." (Ex. 5 at ¶ 8.)  According to Mr. Zeughauser's website, a true and correct printout of which is attached hereto as **Exhibit 6**, his clients include the law firms of Akin Gump Strauss Hauer & Feld; Gibson, Dunn & Crutcher; Howard Rice; K&L Gates; Manatt, Phelps & Phillips; Mayer Brown; Morgan, Lewis & Bockius; Morrison & Foerster; O'Melveny & Myers; Proskauer; and Winston & Strawn.  Mr. Zeughauser's assessment of a "reasonable" hourly rate for Harris & Ruble's attorneys was based directly upon his in-depth knowledge of the prevailing market rates in Los Angeles.  (Ex. 6 at ¶ 9.)  He has "published numerous articles in national, state and local legal publications on the topic of determining the appropriate value of legal services," and he is "a member of the Board of Editors of America Lawyer Magazine," for which he is a regular columnist who "often address[es] the subject of proper techniques for

determining the appropriate value of legal services." (Ex. 5 at ¶ 6.) The following is a partial list of Mr. Zeughauser's fee-related publications:

- <u>Alternative Billing: Clients Aren't Biting</u>, Legal Times, May 1, 2000.
- <u>An Alternative to Alternative Fees</u>, The American Lawyer, Dec. 1996.
- Lawyers are from Mercury, Clients are from Pluto (1999).
- <u>The New Math: Associate Pay Raises Will Have a Domino Effect on the Entire Legal Industry, Clients Will Build In-House Empires, and Many Firms Will Collapse</u>, Legal Times, May 1, 2000, at 46.
- <u>Tower of Billables</u>, 88 A.B.A.J. 14 (Apr. 2002).
- <u>The Use of Alternative Fee Arrangements to Achieve Smart Results and Improve Outside Counsel Relationships</u>, 871 PLI Corp. 47 (1994).
- <u>Using Alternative Fee Arrangements to Improve Client Relationships, Law Firm Profitability and Results</u>, Legal Econ., Apr. 1997 at 22.

21. According to Mr. Zeughauser, my current rate should be $895 per hour and Mr. Zelenski's current rate should be $625 per hour. Although Mr. Zeughauser has thus concluded that Harris & Ruble's rates should be increased beyond those set forth in Table 1, I am *not* requesting any increase for my own hourly rate or Mr. Zelenski's hourly rate. In fact, with respect to the within action, I am computing Harris & Ruble's lodestar using a $600 hourly rate for myself and a $322.50 hourly rate for Mr. Zelenski. These rates were approved by the Central District of California on March 11, 2013, for myself and Mr. Zelenski in an order granting a motion for attorney's fees filed by Harris & Ruble in a wage-and-hour action. A true and correct copy of that order is attached hereto as **Exhibit 7**. Based on these reduced rates, the following Table sets forth Harris & Ruble's total attorney fees for the above-captioned matter:

/ / / / /

| *Table 2:  Reduced Lodestar* |||| 
|---|---|---|---|
| *Attorney* | *Hourly Rate* | *Hours* | *Lodestar* |
| A. Harris | $600 | 63.40 | $38,040.00 |
| D. Zelenski | $322.50 | 161.70 | $52,148.25 |
| *Total* | $400.66 | 225.10 | $90,188.25 |

22.    As noted in Table 2, Harris & Ruble's mixed hourly rate if $400.66.  The mixed hourly rate, as well as Mr. Harris' individual rate and Mr. Zelenski's individual rate, are far less than the rates charged by other firms in Central District wage-and-hour class actions.  For example, in Wang v. Chinese Daily News, Inc., 2008 U.S. Dist. LEXIS 123824 (C.D. Cal. filed Oct. 3, 2008), vacated on other grounds, 132 S. Ct. 74 (2011), the Central District approved hourly rates of up to $800.  Wang, 2008 U.S. Dist. LEXIS at *8–9.  More recently, in Rutti v. Lojack Corp., 2012 U.S. Dist. LEXIS 107677 (C.D. Cal. filed July 31, 2012), the Central District approved hourly rates of up to $750.  Rutti, 2012 U.S. Dist. LEXIS 107677 at *33.

23.    Under the Settlement Agreement, Class Counsel are permitted to seek attorney's fees of up to 33% of the Gross Settlement Payment, *i.e.*, $82,500.  All legal services in this action have been provided on a contingent-fee basis, and the downward-adjusted lodestar for these services—$90,188.25—exceeds the 33% fee allocation by $7,688.25.  Moreover, Harris & Ruble is not the only law firm representing Plaintiff and the putative Class in this case; the Law Office of John P. Dorigan performed extensive services as co-counsel herein.  According to the Declaration of John P. Dorigan filed herewith, Mr. Dorigan performed 82.60 hours of work.  Based on his hourly rate of $450, Mr. Dorigan's lodestar is $37,170.00.  The total lodestar for putative Class Counsel is therefore $127,358.25, reflecting a mixed hourly rate of $413.90 across 307.70 hours of work.  The $127,358.25 exceeds the Settlement Agreement's fee allocation by $44,858.00.

24.    The Settlement Agreement also permits Class Counsel to request

reimbursement for incurred litigation expenses of up to $15,000. To date, Class Counsel have advanced all costs incurred in this case. As reflected on Harris & Ruble's time records, total incurred litigation expenses come to $8,069.34. (Ex. 3 at 31.) When Class Counsel submit their Motion for attorney's fees and reimbursement of costs, they will seek only $8,069.34 in costs, meaning that the remaining $6,930.66 will be distributed to participating Settlement Class members as part of the Net Settlement Fund.

### *Class Notice*

25. The Settlement Agreement calls for the appointment of a Claims Administrator to administer the settlement, including the dissemination of the Class Notice. In Plaintiff's original moving papers, she proposed that Gilardi & Co., LLC ("Gilardi") be appointed as Claims Administrator. Gilardi estimates that it can perform its administration duties associated with the settlement for $19,974.

26. In its Tentative Ruling, the Court explained that it considered the notice and administrative procedures outlined in the Settlement Agreement to be adequate. The Court, however, stated that the form of Class Notice proposed by the parties should be modified to include a separate request-for-exclusion form. A true and correct template copy of a revised Class Notice containing both a claim form and a request-for-exclusion form is attached hereto as **Exhibit 8**.

I have read the foregoing, and the facts set forth therein are true and correct of my own personal knowledge. Executed July 8, 2013, in the County of Los Angeles, State of California.

                                                   /s/ *Alan Harris*
                                                   Alan Harris