Alan Harris (SBN 146079)
David Zelenski (SBN 231768)
HARRIS & RUBLE
6424 Santa Monica Boulevard
Los Angeles, California 90038
Telephone: (323) 962-3777
Facsimile: (323) 962-3004
aharris@harrisandruble.com
dzelenski@harrisandruble.com

John P. Dorigan (SBN 98964)
LAW OFFICES OF JOHN P. DORIGAN
78-560 Via Bolero
La Quinta, California 92253
Telephone: (760) 564-3804
Facsimile: (760) 564-3807
jpdorigan@aol.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COLLETTE McDONALD, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>AIRPORT TERMINAL SERVICES, INC., and DOES 1–100, inclusive,<br><br>　　　　Defendants. | Case No. EDCV 11-01946 VAP (SPx)<br><br>**DECLARATION OF ALAN HARRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF COSTS**<br><br>*Assigned to Hon. Virginia A. Phillips*<br><br>Date: November 18, 2013<br>Time: 2:00 p.m.<br>Courtroom: 2 |

**ALAN HARRIS** declares under penalty of perjury of the laws of the United States and the State of California as follows:

1.  I am a member in good standing of the State Bar of California and am one of the attorneys for Plaintiff Collette McDonald in the within action. I make this Declaration in support of Plaintiff's Motion for attorney's fees and costs. The requested fees and costs were incurred in litigating the above-captioned matter, including negotiating the class-wide Settlement Agreement and General Release ("Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit 1**.[1] I aver that all of the documents appended to this Declaration have been maintained in my office in the ordinary course of business under my direction and control, and, if sworn as a witness, I could competently testify to each and every fact set forth herein from my own personal knowledge.

### *Experience*

2.  I have been and am licensed as an attorney, first in Illinois (1974) and later in California (1989). I am a graduate of the University of Illinois (A.B. 1970, J.D. 1974). After graduation from law school in January 1974, I was hired as a litigation associate at a plaintiffs' antitrust boutique in Chicago, Illinois: Freeman, Freeman & Salzman, P.C. I became a partner in that firm in 1980, and I started my own practice in 1982. I speak before professional organizations on topics of interest to the Bar, and I have represented plaintiffs in complex business litigation for over thirty-six years. See e.g., Illinois v. Ill. Brick Co., Inc., 431 U.S. 720 (1977); In re My Left Hook, LLC, 129 Fed. Appx. 352 (9th Cir. 2005); Gregory v. SCIE, LLC, 317 F.3d 1050 (9th Cir. 2003); In re Blue Coal Corp., 986 F.2d 687 (3d Cir. 1993); In re Blue Coal Corp., 206 B.R. 730 (M.D. Pa. 1997); U.S. v. Gleneagles Inv. Co., Inc., 584 F. Supp. 671, 689 (M.D. Pa. 1984), aff'd. in part and vacated in part, and remanded sub. nom., U.S. v. Tabor Ct. Realty Corp. 803 F.2d 1288 (3d Cir. 1986), cert. den. sub. nom., McClellan Realty Co. v. U.S. 483 U.S. 1005 (1987);

---

[1] Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Settlement Agreement.

In re Uranium Antitrust Litig., 503 F. Supp. 33 (N.D. Ill. 1981); In re Grand Jury, 469 F. Supp. 666 (M.D. Pa. 1980); In re Anthracite Coal Antitrust Litig., 82 F.R.D. 364 (M.D. Pa. 1979), In re Folding Carton Antitrust Litig., 83 F.R.D. 251 (N.D. Ill. 1978); In re Anthracite Coal Antitrust Litig., 78 F.R.D. 709 (M.D. Pa. 1978); In re Masterkey Antitrust Litig., 1977 U.S. Dist. LEXIS 12948 (D. Conn. 1977) (six-week jury trial for plaintiffs); A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp., 68 F.R.D. 383 (N.D. Ill. 1975); In re Cement-Concrete Block, Chicago Area, Grand Jury Proceedings, 381 F. Supp. 1108 (N.D. Ill. 1974); Parmet v. Lapin, 2004 Cal. App. Unpub. LEXIS 5217 (June 1, 2004).  I have gone to jury and bench trials on behalf of plaintiffs and, once, a bench trial for a defendant, Allstate Insurance Company.  I have represented employees in numerous disputes concerning their receipt of wages, both before the California Division of Labor Standards Enforcement and before state and federal courts.  See, e.g., Jacobs v. CSAA Inter Ins. Bureau, 2009 U.S. Dist. LEXIS 37153 (N.D. Cal. filed May 1, 2009); Escobar v. Whiteside Constr. Corp., 2008 U.S. Dist. LEXIS 68439 (N.D. Cal. 2008) (wage-and-hour collective action); Tremblay v. Chevron Stations, Inc., 2008 Westlaw 2020514 (N.D. Cal. 2008) (wage-and-hour collective action); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 93013 (C.D. Cal. filed July 5, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 139764 (C.D. Cal. filed Sept. 27, 2012) (successful motion to correct improper defense contact of class members in a putative wage-and-hour class action); Covillo v. Specialty's Café, 2012 U.S. Dist. LEXIS 114602 (N.D. Cal. filed Aug. 14, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Perez v. Maid Brigade, Inc., 2007 U.S. Dist. LEXIS 78412 (N.D. Cal. filed Oct. 11, 2007) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Hoffman v. Uncle P Prods., 2008 Cal. App. Unpub. LEXIS 3609; Bithell v. E.P. Mgmt. Servs., LP, 2007 WL 4216854 (Cal. Ct. App. 2007) (sustaining a class-wide settlement as fair and

1  reasonable, and finding that class counsel adequately represented the class); DuPont v.
2  Avalon Hollywood Servs., Inc., 2007 WL 93386 (Cal. App. 2007); Gregory v. Superior
3  Court, 2004 WL 2786357 (Cal. Ct. App. 2004).  In addition, I have been appointed lead
4  class counsel in many wage-and-hour class actions.  See, e.g., Kang v. Albertson's, Inc.,
5  C.D. Cal. Case No. CV 07-00894 CAS ($6,637,500 settlement); Tremblay v. Chevron
6  Stations, Inc., N.D. Cal. Case No. CV 07-6009 EDL ($4,500,000 settlement); Doty v.
7  Costco Wholesale Corp., C.D. Cal. Case No. CV 05-3241 FMC ($7,500,000 settlement);
8  Agatep v. Exxon Mobil Corp., C.D. Cal. Case No. CV 05-2342 GAF ($1,500,000
9  settlement); Alfano v. Int'l Coffee & Tea, LLC, C.D. Cal. Case No. CV 04-8996 SVW;
10 Jenne v. On Stage Audio Corp., C.D. Cal. Case No. CV 04-2045 CAS; Hansen v.
11 Advanced Tech Sec. Servs., Inc., Los Angeles Sup. Ct. Case No BC 367175 ($1,050,000
12 settlement); Ross v. Human Res., Inc., Los Angeles Sup. Ct. Case No. BC 351506;
13 Harrington v. Manpay, LLC, Los Angeles Sup. Ct. Case No. BC 312171 ($1,000,000
14 settlement); Brackett v. Saatchi & Saatchi, Los Angeles Sup. Ct. Case No. BC 298728;
15 Readmond v. Straw Dogs, Inc., Los Angeles Sup. Ct. Case No. BC257394; Greenberg v.
16 EP Mgmt. Servs., LP, Los Angeles Sup. Ct. Case No. BC 237787 ($5,348,000
17 settlement); Angel Paws, Inc. v. Avalon Payroll Servs., Inc., Los Angeles Superior Court
18 Case No. BC 188982 ($450,000 settlement); Saunders v. Metro Image Group, San Diego
19 Sup. Ct. Case No. GIC 809753; Stratford v. Citicorp West FSB, Monterey Sup. Ct. Case
20 No. M 81026 ($950,000 settlement); Deckard v. Banco Popular N. Am., related to Silva
21 v. Banco Popular N. Am., C.D. Cal. Case No. CV 08-6709 JFW ($1,050,000 settlement);
22 Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2013 U.S. Dist. LEXIS 109930 (C.D.
23 Cal. filed July 29, 2013) ($834,474 settlement).  The present case, along with a majority
24 of the foregoing cases, was prosecuted on a contingent-fee basis.
25        3.    David Zelenski, an attorney at my firm who worked on the above- captioned
26 matter, has worked with me on numerous wage-and-hour matters.  See, e.g., Gonzalez v.
27 Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 93013 (C.D. Cal. filed July
28 5, 2012) (successful opposition to a defense motion to compel arbitration in a putative

wage-and-hour class action); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 139764 (C.D. Cal. filed Sept. 27, 2012) (successful motion to correct improper defense contact of class members in a putative wage-and-hour class action); Covillo v. Specialty's Café, 2012 U.S. Dist. LEXIS 114602 (N.D. Cal. filed Aug. 14, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Perez v. Maid Brigade, Inc., 2007 U.S. Dist. LEXIS 78412 (N.D. Cal. filed Oct. 11, 2007) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action). He has also been appointed class counsel in numerous wage-and-hour actions. See e.g., Kang v. Albertson's, Inc., C.D. Cal. Case No. CV 07-00894 CAS ($6,637,500 settlement); Doty v. Costco Wholesale Corp., C.D. Cal. Case No. CV 05-3241 FMC ($7,500,000 settlement); Agatep v. Exxon Mobil Corp., C.D. Cal. Case No. CV 05-2342 GAF ($1,500,000 settlement); Stratford v. Citicorp West FSB, Monterey Sup. Ct. Case No. M 81026 ($950,000 settlement); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2013 U.S. Dist. LEXIS 109930 (C.D. Cal. filed July 29, 2013) ($834,474 settlement). Mr. Zelenski is a graduate of Reed College (B.A. 1999) and the University of Southern California (J.D. 2003) (law review). He is a member of the California Bar (June 28, 2004), and his law-school Note, Talent Agents, Personal Managers, and Their Conflicts in the New Hollywood, 76 S. Cal. L. Rev. 979 (2003), has been cited by the California Supreme Court in Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974 (2008). In addition, Mr. Zelenski was designated a 2013 "Super Lawyers Rising Star."

### *Summary of Plaintiff's Claims and of the Settlement*

4.     This case was filed by my office on Plaintiff's behalf on November 2, 2011, in Riverside County Superior Court. As detailed in the concurrently filed Memorandum of points and authorities, Plaintiff's Complaint alleges putative class-wide claims against Defendant Airport Terminal Services, Inc. ("ATS") for (a) the failure to pay meal-period wages for documented missed meal breaks, (b) the failure to reimburse for uniform-maintenance expenses, and (c) the failure to provide adequate workplace seating. The

1  Complaint also alleges claims for (d) "continuing wages" and (e) pay-stub damages that
2  are derivative of the failures to provide meal-period compensation and uniform-
3  maintenance reimbursement. The Settlement Agreement seeks to resolve these claims on
4  behalf of all non-exempt individuals employed by ATS in California since November 2,
5  2007. The Settlement Agreement was the result of a private mediation before Lynn
6  Frank of Frank and Feder—a mediator well-versed in wage-and-hour actions, including
7  those brought in the airline industry. The parties selected Ms. Frank to act as mediator in
8  June 2012. Mediation proceeded three months later, during which the parties executed a
9  short-form Memorandum of Understanding providing for the creation of a $250,000
10 settlement fund. Over the next several months, the parties negotiated the terms of a long-
11 form settlement agreement encompassing the terms of the Memorandum of
12 Understanding. In May 2013, those negotiations resulted in the execution of the
13 Settlement Agreement that is presently before the Court.

14     5.    *The Settlement Class*. According to data provided by ATS, there are
15 approximately 1,238 individuals who have been employed by ATS as non-exempt
16 employees since November 2, 2007. Also according to data provided to my office by
17 ATS, each of these individuals was employed by ATS as an "airport agent."

18     6.    *Plaintiff's Underlying Meal-Period Claim*. As alleged in the Complaint,
19 Plaintiff's missed-meal claim is limited to those situations in which ATS's payroll
20 records reflect that airport agents had a "NO LUNCH" coding on their time sheets.
21 Because the Settlement Agreement's release is limited to the factual allegations in the
22 Complaint, agents who do not exclude themselves from the settlement will only be
23 releasing meal-break claims that stem from the "NO LUNCH" allegations. Based on my
24 discussions with Plaintiff, on a review of her time sheets, on my interviews with various
25 airport agents employed by ATS since November 2007, and on the full and frank
26 exchange of information throughout the settlement-negotiation process, ATS's
27 timekeeping system would automatically deduct a meal break each workday for all
28 agents. Accordingly, when an agent could not take a meal break, ATS would have to go

into its timekeeping system to reverse the automatic deduction so that the correct number of hours worked by agents were reflected therein. If the missed break was attributable to the nature of the work—*i.e.*, if the agent was simply too busy to take a break on a particular day—the agent was required to submit a "NO LUNCH" form to ATS so attesting. I have reviewed these "NO LUNCH" forms, and they clearly state at the top that, "[g]iven the nature of the work at ATS, there are times when an employee may not be able to take a lunch period." A true and correct, redacted copy of one such "NO LUNCH" form is attached hereto as **Exhibit 2**.

7. With respect to each instance when a "NO LUNCH" form was submitted, ATS marked the relevant agent's time records with a "NO LUNCH" notation. During the settlement-negotiation process, ATS provided data indicating that, since November 2, 2011, there were a total of 3,701 such "NO LUNCH" codings across the Settlement Class. These 3,701 "NO LUNCH" codings were experienced by 410 agents. According to Plaintiff, she herself experienced at least ten such codings since November 2011. (July 8, 2013, Supplemental Decl. of Collette McDonald in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class ("July 8, 2013, McDonald Decl.") [Docket No. 33] ¶ 2.) Based on my discussions with Plaintiff, on a review of her pay records, and on my interviews with various airport agents employed by ATS since November 2007, ATS *never* paid the meal-period "premium" wage specified by California Labor Code section 226.7 for any of these "NO LUNCH" workdays. ATS itself has been extremely forthcoming in terms of explaining its "NO LUNCH" policies and confirmed during settlement negotiations that it never pays meal-period wages for these codings. Again, this was ATS's policy notwithstanding the fact that the "NO LUNCH" forms attribute the reason for the missed meals to the nature of the work at ATS.

8. In connection with negotiating the Settlement Agreement, ATS provided my office with data indicating that the average hourly wage for the Settlement Class was $12.47. Accordingly, total meal-period damages for Plaintiff's "NO LUNCH" claim are

estimated to be $46,151.47 (= 3,701 "NO LUNCH" workdays × $12.47 hourly wage). Assuming an even distribution of the 3,701 "NO LUNCH" codings across the 410 affected agents, each such agent experienced an average of 9 "NO LUNCH" codings. On a *per capita* basis, each of the 410 agents is therefore entitled to approximately $112 (= $12.47 hourly wage × 9 "NO LUNCH" workdays) in meal-period premium pay under section 226.7.

9. Under the Settlement Agreement, ATS has agreed to make a Gross Settlement Payment of $250,000. The Gross Settlement Payment includes amounts for fees, expenses, and a possible incentive payment to Plaintiff; after deducting those amounts, the remaining portion (the "Net Settlement Fund") will be distributed to Class Members who submit valid claim forms. Assuming that the Court approves $82,500 in attorney's fees (equal to 33% of the Gross Settlement Payment), $8,069.34 in litigation expenses, $20,000 in claims-administration expenses, and a $5,000 incentive award, $134,430.66 will remain for distribution to participating Class Members. Under the Settlement Agreement, 33.33% of the Net Settlement Fund, or $44,805.74, will be shared by those of the 410 "NO LUNCH" agents who submit valid claim forms. In other words, although the Settlement Class consists of 1,238 agents, this 33.33% "sub-fund" will be earmarked exclusively for the 410 agents who experienced "NO LUNCH" codings. The $44,805.74 sub-fund amount is only $1,345.73 less than the total "NO LUNCH" damages calculated in paragraph 7 above. Accordingly, even if 100% of all 410 agents submit valid claim forms, they will be compensated nearly in full, as each will receive, on average, approximately $110 (= $44,805.74 ÷ 410 agents) under the settlement, *i.e.*, only $2 less than the average *per capita* damages calculated in paragraph 8 above.

10. Of course, as explained in Plaintiff's moving papers, it is highly unlikely that everyone in the Settlement Class will submit claims. Based on statistics provided to me by the Claims Administrator selected by the parties, it appears that between 25% to 50% of the Settlement Class will submit claims. If 50% submit claims, the average settlement payment for "NO LUNCH" claims doubles to approximately $219

(= $44,805.74 ÷ 205 agents), *i.e.*, over $100 more than the average *per capita* damages calculated in paragraph 8 above. If the participation rate is 25%, the average settlement payment increases to approximately $435 (= $44,805.74 ÷ 103 agents), *i.e.*, over $300 more than the average *per capita* damages calculated in paragraph 8 above.

11. The estimated recoveries calculated in paragraphs 9 and 10 above are averages. Under the Settlement Agreement, the $44,805.74 portion of the Net Settlement Fund allocated for Plaintiff's "NO LUNCH" claim will be shared by participating Class Members based on the relative number of "NO LUNCH" codings they experienced. This ensures that the $44,805.74 will be divided in the most equitable manner possible, with Class Members who experienced relatively more "NO LUNCH" workdays receiving a larger share than those who experienced relatively fewer "NO LUNCH" workdays. Assuming, then, a 100% participation rate, some Class Members will receive more than $110, and some will receive less than $110; assuming a 50% participation rate, some participating Class Members will receive more than $219, and some will receive less than $219; and assuming a 25% participation rate, some participating Class Members will receive more than $435, and some will receive less than $435.

12. ***Plaintiff's Underlying Uniform-Cleaning Claim***. Plaintiff's expense-reimbursement claim, brought pursuant to Labor Code section 2802, is limited to the allegation that ATS failed to reimburse airport agents for the costs of maintaining their uniforms. As with the meal-break claim, because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing expense-reimbursement claims that stem from the uniform-cleaning allegations, leaving intact any claims for the failure to reimburse for other expenses. Based on my discussions with Plaintiff, on my interviews with various airport agents employed by ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process, ATS required all of its airport agents to wear work uniforms, including Plaintiff herself. Based again on that same information—particularly on my interviews with numerous airport agents—

although these uniforms were provided to agents free of charge, agents were told that it was their responsibility to keep their uniforms clean. According to airport agents, ATS never explained to them that they could request cleaning-cost reimbursement, and ATS never provided any such reimbursement. Plaintiff herself declares as much in her accompanying Declaration. (July 8, 2013, McDonald Decl. [Docket No. 33] ¶ 4.)

13. Under the Settlement Agreement, in satisfaction of Plaintiff's uniform-cleaning claim, 66.67% of the $134,430.66 Net Settlement Fund, or $89,624.92, will be distributed on a *pro rata* basis to those of the 1,238 agents who submit valid claim forms. Assuming a 100% participation rate, each agent will receive approximately $72 (= $89,624.92 ÷ 1,238 agents) in uniform-cleaning reimbursement. Based again, though, on statistics provided to me by the Claims Administrator selected by the parties, it appears that between 25% to 50% of the Settlement Class will submit claims. If 50% submit claims, then each participating Class Member will receive approximately $145 (= $89,624.92 ÷ 619 agents); if 25% submit claims, then each participating Class Member will receive approximately $289 (= $89,624.92 ÷ 310). In my opinion, these amounts are reasonable to compensate employees for the costs of maintaining their uniforms. I have had an opportunity to personally examine agents' uniforms, and, during my investigation, many airport agents explained to me that there was no directive from ATS that their uniforms be dry-cleaned. In addition, during my discussions with various agents and with Defendant during the settlement-negotiation process, I was made aware of the fact that, in lieu of cleaning their uniforms, agents could simply request new garments from ATS. These facts minimize the extent of damages attributable to uniform-cleaning costs.

14. ***The Reasonableness of the Estimated Payments***. To recap, based on the above figures, participating Class Members will likely receive between $219 to $435 for their "NO LUNCH" codings (to the extent they experienced any such codings) and between $145 to $289 for uniform-cleaning reimbursement. After extensive discussions with my colleagues, I have formed the opinion that these amounts are fair. First, as noted

above, the meal-period settlement amounts will provide participating Class Members with *more* than 100% of what is actually owed under section 226.7 of the Labor Code. In addition, because agents' uniforms were not required by ATS to be dry cleaned, the reimbursement portion of the settlement represents a significant recovery for arguably minimal damages.

15. I note that the Settlement Agreement seeks to resolve derivative claims for improper pay stubs and continuing wages stemming from the two underlying causes of action alleged in the Complaint. As with the underlying claims for missed meals and expense reimbursement, because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing derivative pay-stub and continuing-wage claims that stem from the "NO LUNCH" and uniform-cleaning allegations. Moreover, as explained in Plaintiff's Memorandum filed herewith, the Airline Deregulation Act ("ADA") may operate to preempt Plaintiff's meal-period claims. ATS has strenuously advanced the ADA preemption defense since this case's inception and throughout the entirety of the settlement-negotiation process, particularly during the mediation. According to ATS, compliance with California's meal-period statute would have an immediate effect on the scheduling of flights and an ultimate "pass-through" effect on air fare. If ADA preemption applies, then *none* of the Settlement Class are entitled to *any* meal-period damages, let alone damages stemming from Plaintiff's meal-period-derivative claims. Furthermore, also as discussed in Plaintiff's Memorandum filed herewith, even if Plaintiff's underlying meal-period claim is not preempted, recent Central District of California authority holds that derivative claims under sections 203 and 226 cannot be based on violations of California's meal-period statute. The recoveries noted in paragraph 14 above are therefore reasonable in light of the substantial risk discounts that apply in the context of settlement. For instance, consider Plaintiff's pay-stub claim. The pay-stub claim is based on the Labor Code's requirement that wage statements be provided to employees with each paycheck, listing the correct amount of gross and net

wages earned. The claim is derivative in the sense that, whenever ATS coded a "NO LUNCH" workday for an airport agent, ATS should have paid a missed-break wage—a wage that should have appeared on the agent's pay stub. Because Plaintiff's pay-stub claim is wholly derivative of the missed-meal allegations, it is limited to those 410 Settlement Class members who experienced "NO LUNCH" workdays. As noted in paragraph 8 above, each Settlement Class member experienced, on average, a total of nine "NO LUNCH" workdays. Accordingly, on average, each Settlement Class member received, at most, nine separate pay stubs that failed to list additional wages for "NO LUNCH" workdays.[2] Under the Labor Code, total statutory damages for these violations equal $850. See Cal. Lab. Code § 226(e) (specifying damage amounts of $50 for the initially defective pay stub and $100 for each defective pay stub thereafter). As explained in paragraph 14 above, participating Class Members will likely receive between $219 to $435 from that portion of the Net Settlement Fund allocated to address the Complaint's meal-period claim. Because, on average, each Settlement Class member has only $112 in "actual" meal-period damages, the additional $107 to $323 that each participating Class Member will, on average, likely receive represents between 13% to 38% of total pay-stub damages.

16. ***The Settlement Agreement's Non-Monetary Relief.*** In addition to providing the above-described monetary relief, the Settlement Agreement requires ATS to request the installation of additional, regulator-permitted seating for its agents at airport worksites. The Settlement Agreement also requires ATS to request the installation of regulator-permitted mats at its airport worksites in order to alleviate the stress of standing when seating is an impossibility. This relief is designed to address Plaintiff's allegations in the Complaint that ATS failed to provide adequate seating at its airport worksites. As explained in Plaintiff's Memorandum filed herewith, the seating

---

[2] Of course, it is possible that all "NO LUNCH" workdays experienced by a given agent occurred over the course of, say, two pay periods, meaning that he or she received only two defective pay stubs, not nine. In other words, nine pay-stub violations occur only if each "NO LUNCH" workday occurred in its own pay period.

allegations have been resolved on a non-monetary basis because, under the current state of the law, claims for improper seating do not give rise to claims for damages. Based on my discussions with Plaintiff, on my interviews with various airport agents employed by ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process—including the provision by ATS of photographic evidence documenting the locations in which it presently does provide employee seating—I have concluded that this non-monetary relief is appropriate. This is particularly true in light of the fact that, because Plaintiff is a former employee, she lacked standing (so to speak) to obtain such relief after a full trial on the merits of her seating claim.

### *Class Counsel's Lodestar*

17.     Attached hereto as **Exhibit 3** is a true and correct copy of detailed records of the time and expenses incurred by Harris & Ruble in, *inter alia*, initiating the case, litigating the action, preparing for and attending mediation, negotiating the settlement, preparing the settlement-related documents, and attempting to secure preliminary approval of the settlement. The time records run through July 5, 2013, and so do not reflect any time spent preparing the present fee request. Nor do the records reflect any time that will be incurred in seeking final approval of the settlement. It is my practice and the policy of Harris & Ruble that all employees record their professional time in tenth-of-an-hour increments on a contemporaneous basis, and Exhibit 3 reflects that practice. In addition, I regularly review the time and expense records of all Harris & Ruble employees, I have reviewed all of the records attached as Exhibit 3, and I believe that they accurately—yet conservatively—represent the time productively and necessarily spent in the prosecution of this case.

18.     Exhibit 3 reflects the following attorney hours and rates:

/ / / / /

| *Table 1:  Unadjusted Lodestar* |||| 
|---|---|---|---|
| *Attorney* | *Hourly Rate* | *Hours* | *Lodestar* |
| A. Harris | $800 | 63.40 | $50,720.00 |
| D. Zelenski | $430 | 161.70 | $69,531.00 |
| *Total* | $534.21 | 225.10 | $120,251.00 |

(Ex. 3 at 29.)  Harris & Ruble has filed motions for attorney's fees in common-fund settlements based on these hourly rates, and those motions have been approved by courts in both Los Angeles and San Francisco.

19.  ***Class Counsel's Hourly Rates.***  Recently, in an effort to bring Harris & Ruble's rates up to date with the current prevailing market rate, I retained the services of an expert in the field, Peter D. Zeughauser, to opine on proper market-based billing rates for class-action cases and to provide me with insight in setting rates for Harris & Ruble's hourly clients.  Mr. Zeughauser has executed a Declaration setting forth his opinion as to the rates for Harris & Ruble's attorneys, including rates for myself and Mr. Zelenski.  A true and correct copy of his Declaration is attached hereto as **Exhibit 4**.  In his Declaration, Mr. Zeughauser notes that, for over seventeen years, he "ha[s] served as a legal management consultant to law firms throughout the United States[ and] . . . ha[s] also consulted with numerous law firms with offices in Los Angeles and throughout the United States regarding the appropriate amount to charge clients for services rendered by the firms." (Ex. 4 at ¶ 8.)  According to Mr. Zeughauser's website, a true and correct printout of which is attached hereto as **Exhibit 5**, his clients include the law firms of Akin Gump Strauss Hauer & Feld; Gibson, Dunn & Crutcher; Howard Rice; K&L Gates; Manatt, Phelps & Phillips; Mayer Brown; Morgan, Lewis & Bockius; Morrison & Foerster; O'Melveny & Myers; Proskauer; and Winston & Strawn.  (Ex. 5 at 1–2.)  Mr. Zeughauser's assessment of a "reasonable" hourly rate for Harris & Ruble's attorneys was based directly upon his in-depth knowledge of the prevailing market rates in Los Angeles.  (Ex. 4 at ¶ 9.)  He has "published numerous articles in national, state and local

legal publications on the topic of determining the appropriate value of legal services," and he is "a member of the Board of Editors of America Lawyer Magazine," for which he is a regular columnist who "often address[es] the subject of proper techniques for determining the appropriate value of legal services." (Ex. 4 at ¶ 6.) The following is a partial list of Mr. Zeughauser's fee-related publications:

- <u>Alternative Billing: Clients Aren't Biting</u>, Legal Times, May 1, 2000.
- <u>An Alternative to Alternative Fees</u>, The American Lawyer, Dec. 1996.
- Lawyers are from Mercury, Clients are from Pluto (1999).
- <u>The New Math: Associate Pay Raises Will Have a Domino Effect on the Entire Legal Industry, Clients Will Build In-House Empires, and Many Firms Will Collapse</u>, Legal Times, May 1, 2000, at 46.
- <u>Tower of Billables</u>, 88 A.B.A.J. 14 (Apr. 2002).
- <u>The Use of Alternative Fee Arrangements to Achieve Smart Results and Improve Outside Counsel Relationships</u>, 871 PLI Corp. 47 (1994).
- <u>Using Alternative Fee Arrangements to Improve Client Relationships, Law Firm Profitability and Results</u>, Legal Econ., Apr. 1997 at 22.

20. According to Mr. Zeughauser, my current rate should be $895 per hour and Mr. Zelenski's current rate should be $625 per hour. (Ex. 4 at ¶ 11.) Although Mr. Zeughauser has thus concluded that Harris & Ruble's rates should be increased beyond those set forth in table 1 above, I am *not* requesting any increase for my own hourly rate or Mr. Zelenski's hourly rate. In fact, with respect to the within action, I am requesting that Harris & Ruble's lodestar be computed using a $600 hourly rate for myself and a $322.50 hourly rate for Mr. Zelenski. These rates were approved by the Central District of California on March 11, 2013, for myself and Mr. Zelenski in an order granting a motion for attorney's fees filed by Harris & Ruble in a wage-and-hour action. A true and correct copy of that order is attached hereto as **Exhibit 6**. Based on these reduced rates, the following table sets forth Harris & Ruble's total attorney fees for the above-captioned matter:

| Table 2: Reduced Lodestar | | | |
|---|---|---|---|
| *Attorney* | *Hourly Rate* | *Hours* | *Lodestar* |
| A. Harris | $600 | 63.40 | $38,040.00 |
| D. Zelenski | $322.50 | 161.70 | $52,148.25 |
| *Total* | $400.66 | 225.10 | $90,188.25 |

21. As noted in table 2, Harris & Ruble's mixed hourly rate if $400.66. The mixed hourly rate, as well as Mr. Harris' individual rate and Mr. Zelenski's individual rate, is far less than the rates charged by other firms in Central District wage-and-hour class actions. For example, in Wang v. Chinese Daily News, Inc., 2008 U.S. Dist. LEXIS 123824 (C.D. Cal. filed Oct. 3, 2008), vacated on other grounds, 132 S. Ct. 74 (2011), the Central District approved hourly rates of up to $800. Wang, 2008 U.S. Dist. LEXIS at *8–9. More recently, in Rutti v. Lojack Corp., 2012 U.S. Dist. LEXIS 107677 (C.D. Cal. filed July 31, 2012), the Central District approved hourly rates of up to $750. Rutti, 2012 U.S. Dist. LEXIS 107677 at *33.

22. Under the Settlement Agreement, Class Counsel are permitted to seek attorney's fees of up to 33% of the Gross Settlement Payment, *i.e.*, $82,500. All legal services in this action have been provided on a contingent-fee basis, and the downward-adjusted lodestar for these services—$90,188.25—exceeds the 33% fee allocation by $7,688.25. Moreover, Harris & Ruble is not the only law firm representing Plaintiff and the Settlement Class in this case; the Law Office of John P. Dorigan performed extensive services as co-counsel herein. According to the Declaration of John P. Dorigan filed herewith, Mr. Dorigan performed 82.60 hours of work. (Sept. 26, 2013, Decl. of John P. Dorigan in Supp. of Mot. for Att'ys Fees & Reimbursement of Costs ("Sept. 26, 2013, Dorigan Decl.") [Docket No. 40] ¶ 5 & Ex. 1 at 5.) Based on his hourly rate of $450, Mr. Dorigan's lodestar is $37,170.00. (Sept. 26, 2013, Dorigan Decl. [Docket No. 40] ¶ 5 & Ex. 1 at 5.) The total lodestar for Class Counsel is therefore $127,358.25, reflecting a mixed hourly rate of $413.90 across 307.70 hours of work. The $127,358.25 exceeds the

1  Settlement Agreement's fee allocation by $44,858.25.

2      23.    As explained in the Memorandum filed herewith, Class Counsel's lodestar can be recomputed—and, in fact, adjusted upward—based on Laffey matrix. Attached hereto as **Exhibit 7** is a true and correct copy of the adjusted Laffey matrix, available at http://www.laffeymatrix.com/see.html. Attached hereto as **Exhibit 8** are true and correct copies of salary tables from the U.S. Office of Personnel Management. As detailed in the accompanying Memorandum, the salary tables can be used to modify the figures in the adjusted Laffey matrix to reflect cost-of-living differentials across different geographical regions. Plaintiff has requested that the Court take judicial notice of both the adjusted Laffey matrix and the salary tables in her Request for judicial notice, filed herewith.

     24.    Aside from fees, the Settlement Agreement also permits Class Counsel to request reimbursement for incurred litigation expenses of up to $15,000. To date, Class Counsel have advanced all costs incurred in this case. As reflected on Harris & Ruble's time records, total incurred litigation expenses come to $8,069.34. (Ex. 3 at 31.) Because Class Counsel are seeking only $8,069.34 in costs, the remaining $6,930.66 will be distributed to participating Class Members as part of the Net Settlement Fund.

### *Class Notice*

     25.    In granting preliminary approval of the Settlement Agreement, the Court approved the form of the Class Notice, claim form, and request-for-exclusion form attached hereto as **Exhibit 9**. These documents were mailed to the Settlement Class on August 26, 2013, by the Gilardi & Co., LLC ("Gilardi")—the Claims Administrator selected by the parties. As stated in the Class Notice, Settlement Class members have until October 10, 2013, to submit claim forms or to request exclusion. (Ex. 9 at 2–4.) As also stated in the Class Notice, Settlement Class members have until October 25, 2013, to file objections to the Settlement Agreement. (Ex. 9 at 2–4.)

     26.    Since the mailing of the Class Notice, Gilardi has regularly informed Class Counsel as to the number of submitted claims, exclusion requests, and objections. According to Gilardi, as of the filing of this Declaration, 269 Class Members have

17
DECL. OF ALAN HARRIS IN SUPP. OF PL.'S MOT. FOR AWARD OF ATT'YS FEES & COSTS

submitted claim forms, and only 12 agents have requested exclusion. In addition, only objection has been submitted. On September 17, 2013, the Court rejected that objection for noncompliance with the Central District's Local Rules. (See generally Sept. 20, 2013, Notice of Doc. Discrepancies [Docket No. 37].)

      I have read the foregoing, and the facts set forth therein are true and correct of my own personal knowledge. Executed September 26, 2013, in the County of Los Angeles, State of California.

                                        /s/ *Alan Harris*
                                        Alan Harris