Alan Harris (SBN 146079)
David Zelenski (SBN 231768)
HARRIS & RUBLE
6424 Santa Monica Boulevard
Los Angeles, California 90038
Telephone: (323) 962-3777
Facsimile: (323) 962-3004
aharris@harrisandruble.com
dzelenski@harrisandruble.com

John P. Dorigan (SBN 98964)
LAW OFFICES OF JOHN P. DORIGAN
78-560 Via Bolero
La Quinta, California 92253
Telephone: (760) 564-3804
Facsimile: (760) 564-3807
jpdorigan@aol.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLETTE McDONALD, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>AIRPORT TERMINAL SERVICES, INC., and DOES 1–100, inclusive,<br><br>    Defendants. | Case No. EDCV 11-01946 VAP (SPx)<br><br>**DECLARATION OF ALAN HARRIS IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS-ACTION SETTLEMENT**<br><br>*Assigned to Hon. Virginia A. Phillips*<br><br>Date: November 18, 2013<br>Time: 2:00 p.m.<br>Courtroom: 2 |

**ALAN HARRIS** declares under penalty of perjury of the laws of the United States and the State of California as follows:

1.  I am a member in good standing of the State Bar of California and am one of the attorneys for Plaintiff Collette McDonald in the within action. I make this Declaration in support of Plaintiff's Motion for final approval of the class-wide Settlement Agreement and General Release ("Settlement Agreement") reached in the within action. A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit 1**.[1] I aver that all of the documents appended to this Declaration have been maintained in my office in the ordinary course of business under my direction and control, and, if sworn as a witness, I could competently testify to each and every fact set forth herein from my own personal knowledge.

*Experience of Class Counsel*

2.  I have been and am licensed as an attorney, first in Illinois (1974) and later in California (1989). I am a graduate of the University of Illinois (A.B. 1970, J.D. 1974). After graduation from law school in January 1974, I was hired as a litigation associate at a plaintiffs' antitrust boutique in Chicago, Illinois: Freeman, Freeman & Salzman, P.C. I became a partner in that firm in 1980, and I started my own practice in 1982. I speak before professional organizations on topics of interest to the Bar, and I have represented plaintiffs in complex business litigation for over thirty-eight years. See e.g., Illinois v. Ill. Brick Co., Inc., 431 U.S. 720 (1977); In re My Left Hook, LLC, 129 Fed. Appx. 352 (9th Cir. 2005); Gregory v. SCIE, LLC, 317 F.3d 1050 (9th Cir. 2003); In re Blue Coal Corp., 986 F.2d 687 (3d Cir. 1993); In re Blue Coal Corp., 206 B.R. 730 (M.D. Pa. 1997); U.S. v. Gleneagles Inv. Co., Inc., 584 F. Supp. 671, 689 (M.D. Pa. 1984), aff'd. in part and vacated in part, and remanded sub. nom., U.S. v. Tabor Ct. Realty Corp. 803 F.2d 1288 (3d Cir. 1986), cert. den. sub. nom., McClellan Realty Co. v. U.S. 483 U.S. 1005 (1987); In re Uranium Antitrust Litig., 503 F. Supp. 33 (N.D. Ill. 1981); In re Grand Jury, 469 F.

---

[1] Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Settlement Agreement.

Supp. 666 (M.D. Pa. 1980); <u>In re Anthracite Coal Antitrust Litig.</u>, 82 F.R.D. 364 (M.D. Pa. 1979), <u>In re Folding Carton Antitrust Litig.</u>, 83 F.R.D. 251 (N.D. Ill. 1978); <u>In re Anthracite Coal Antitrust Litig.</u>, 78 F.R.D. 709 (M.D. Pa. 1978); <u>In re Masterkey Antitrust Litig.</u>, 1977 U.S. Dist. LEXIS 12948 (D. Conn. 1977) (six-week jury trial for plaintiffs); <u>A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp.</u>, 68 F.R.D. 383 (N.D. Ill. 1975); <u>In re Cement-Concrete Block, Chicago Area, Grand Jury Proceedings</u>, 381 F. Supp. 1108 (N.D. Ill. 1974); <u>Parmet v. Lapin</u>, 2004 Cal. App. Unpub. LEXIS 5217 (June 1, 2004).  I have gone participated in class-action jury and bench trials on behalf of plaintiffs and, once, a class-action bench trial for a defendant, Allstate Insurance Company.  I have represented employees in numerous disputes concerning their receipt of wages, both before the California Division of Labor Standards Enforcement and before state and federal courts.  <u>See</u>, <u>e.g.</u>, <u>Jacobs v. CSAA Inter Ins. Bureau</u>, 2009 U.S. Dist. LEXIS 37153 (N.D. Cal. filed May 1, 2009); <u>Escobar v. Whiteside Constr. Corp.</u>, 2008 U.S. Dist. LEXIS 68439 (N.D. Cal. 2008) (wage-and-hour collective action); <u>Tremblay v. Chevron Stations, Inc.</u>, 2008 Westlaw 2020514 (N.D. Cal. 2008) (wage-and-hour collective action); <u>Gonzalez v. Preferred Freezer Servs. LBF, LLC</u>, 2012 U.S. Dist. LEXIS 93013 (C.D. Cal. filed July 5, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); <u>Gonzalez v. Preferred Freezer Servs. LBF, LLC</u>, 2012 U.S. Dist. LEXIS 139764 (C.D. Cal. filed Sept. 27, 2012) (successful motion to correct improper defense contact of class members in a putative wage-and-hour class action); <u>Covillo v. Specialty's Café</u>, 2012 U.S. Dist. LEXIS 114602 (N.D. Cal. filed Aug. 14, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); <u>Perez v. Maid Brigade, Inc.</u>, 2007 U.S. Dist. LEXIS 78412 (N.D. Cal. filed Oct. 11, 2007) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); <u>Hoffman v. Uncle P Prods.</u>, 2008 Cal. App. Unpub. LEXIS 3609; <u>Bithell v. E.P. Mgmt. Servs., LP</u>, 2007 WL 4216854 (Cal. Ct. App. 2007) (sustaining a class-wide settlement as fair and reasonable, and finding that class counsel adequately

represented the class); DuPont v. Avalon Hollywood Servs., Inc., 2007 WL 93386 (Cal. App. 2007); Gregory v. Superior Court, 2004 WL 2786357 (Cal. Ct. App. 2004).  In addition, I have been appointed lead class counsel in many wage-and-hour class actions. See, e.g., Kang v. Albertson's, Inc., C.D. Cal. Case No. CV 07-00894 CAS ($6,637,500 settlement); Tremblay v. Chevron Stations, Inc., N.D. Cal. Case No. CV 07-6009 EDL ($4,500,000 settlement); Doty v. Costco Wholesale Corp., C.D. Cal. Case No. CV 05-3241 FMC ($7,500,000 settlement); Agatep v. Exxon Mobil Corp., C.D. Cal. Case No. CV 05-2342 GAF ($1,500,000 settlement); Alfano v. Int'l Coffee & Tea, LLC, C.D. Cal. Case No. CV 04-8996 SVW; Jenne v. On Stage Audio Corp., C.D. Cal. Case No. CV 04-2045 CAS; Hansen v. Advanced Tech Sec. Servs., Inc., Los Angeles Sup. Ct. Case No BC 367175 ($1,050,000 settlement); Ross v. Human Res., Inc., Los Angeles Sup. Ct. Case No. BC 351506; Harrington v. Manpay, LLC, Los Angeles Sup. Ct. Case No. BC 312171 ($1,000,000 settlement); Brackett v. Saatchi & Saatchi, Los Angeles Sup. Ct. Case No. BC 298728; Readmond v. Straw Dogs, Inc., Los Angeles Sup. Ct. Case No. BC257394; Greenberg v. EP Mgmt. Servs., LP, Los Angeles Sup. Ct. Case No. BC 237787 ($5,348,000 settlement); Angel Paws, Inc. v. Avalon Payroll Servs., Inc., Los Angeles Superior Court Case No. BC 188982 ($450,000 settlement); Saunders v. Metro Image Group, San Diego Sup. Ct. Case No. GIC 809753; Stratford v. Citicorp West FSB, Monterey Sup. Ct. Case No. M 81026 ($950,000 settlement); Deckard v. Banco Popular N. Am., related to Silva v. Banco Popular N. Am., C.D. Cal. Case No. CV 08-6709 JFW ($1,050,000 settlement); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2013 U.S. Dist. LEXIS 109930 (C.D. Cal. filed July 29, 2013) ($834,474 settlement).  The present case, along with a majority of the foregoing cases, was prosecuted on a contingent-fee basis.

3.   David Zelenski, an attorney at my firm who worked on the above-captioned matter, has worked with me on numerous wage-and-hour matters.  See, e.g., Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S. Dist. LEXIS 93013 (C.D. Cal. filed July 5, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2012 U.S.

Dist. LEXIS 139764 (C.D. Cal. filed Sept. 27, 2012) (successful motion to correct improper defense contact of class members in a putative wage-and-hour class action); Covillo v. Specialty's Café, 2012 U.S. Dist. LEXIS 114602 (N.D. Cal. filed Aug. 14, 2012) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action); Perez v. Maid Brigade, Inc., 2007 U.S. Dist. LEXIS 78412 (N.D. Cal. filed Oct. 11, 2007) (successful opposition to a defense motion to compel arbitration in a putative wage-and-hour class action).  He has also been appointed class counsel in numerous wage-and-hour actions.  See e.g., Kang v. Albertson's, Inc., C.D. Cal. Case No. CV 07-00894 CAS ($6,637,500 settlement); Doty v. Costco Wholesale Corp., C.D. Cal. Case No. CV 05-3241 FMC ($7,500,000 settlement); Agatep v. Exxon Mobil Corp., C.D. Cal. Case No. CV 05-2342 GAF ($1,500,000 settlement); Stratford v. Citicorp West FSB, Monterey Sup. Ct. Case No. M 81026 ($950,000 settlement); Gonzalez v. Preferred Freezer Servs. LBF, LLC, 2013 U.S. Dist. LEXIS 109930 (C.D. Cal. filed July 29, 2013) ($834,474 settlement).  Mr. Zelenski is a graduate of Reed College (B.A. 1999) and the University of Southern California (J.D. 2003) (law review).  He is a member of the California Bar (June 28, 2004), and his law-school Note, Talent Agents, Personal Managers, and Their Conflicts in the New Hollywood, 76 S. Cal. L. Rev. 979 (2003), has been cited by the California Supreme Court in Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974 (2008).  In addition, Mr. Zelenski was designated a 2013 "Super Lawyers Rising Star."

4. In addition to Mr. Zelenski, John Dorigan of the Law Offices of John P. Dorigan performed extensive services as co-counsel in this action.  Mr. Dorigan's experience is outlined in his Declaration filed on September 26, 2013.  (See generally Sept. 26, 2013, Decl. of John P. Dorigan in Supp. of Pl.'s Mot. for Award of Att'ys Fees & Reimbursement of Costs ("Sept. 26, 2013, Dorigan Decl.") [Docket No. 40].)

### *Summary of Plaintiff's Claims and of the Settlement*

5. This case was filed by my office on Plaintiff's behalf on November 2, 2011, in Riverside County Superior Court.  As detailed in the concurrently filed Memorandum

of points and authorities, Plaintiff's Complaint alleges class-wide claims against Defendant Airport Terminal Services, Inc. ("ATS") for (a) the failure to pay meal-period wages for documented missed meal breaks, (b) the failure to reimburse for uniform-maintenance expenses, and (c) the failure to provide adequate workplace seating. The Complaint also alleges claims for (d) "continuing wages" and (e) pay-stub damages that are derivative of the failures to provide meal-period compensation and uniform-maintenance reimbursement. The Settlement Agreement seeks to resolve these claims on behalf of all non-exempt individuals employed by ATS in California at any time from November 2, 2007, through July 16, 2013. The Settlement Agreement was the result of a private mediation before Lynn Frank of Frank and Feder—a mediator well-versed in wage-and-hour actions, including those brought in the airline industry. The parties selected Ms. Frank to act as mediator in June 2012. Mediation proceeded three months later, during which the parties executed a short-form Memorandum of Understanding providing for the creation of a $250,000 settlement fund. Over the next several months, the parties negotiated the terms of a long-form settlement agreement encompassing the terms of the Memorandum of Understanding. In May 2013, those negotiations resulted in the execution of the Settlement Agreement that is presently before the Court.

6. ***The Settlement Class***. According to data provided by ATS to the Claims Administrator selected by the parties, there are approximately 1,238 individuals who have been employed by ATS as non-exempt employees during the period from November 2, 2007, through July 16, 2013. (Oct. 21, 2013, Decl. of Markham Sherwood re Mailing of Notice to Class of Proposed Settlement of Class Action, Claim Form, & Req. for Exclusion Form & Report on Claim Forms & Exclusions Received ("Oct. 21, 2013, Sherwood Decl.") [Docket No. 46] ¶ 4.) Also according to data provided to my office by ATS, each of these individuals was employed by ATS as an "airport agent."

7. ***Plaintiff's Underlying Meal-Period Claim***. As alleged in the Complaint, Plaintiff's missed-meal claim is limited to those situations in which ATS's payroll records reflect that airport agents had a "NO LUNCH" coding on their time sheets.

Because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing meal-break claims that stem from the "NO LUNCH" allegations. Based on my discussions with Plaintiff, on a review of her time sheets, on my interviews with various airport agents employed by ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process, ATS's timekeeping system would automatically deduct a meal break each workday for all agents. Accordingly, when an agent could not take a meal break, ATS would have to go into its timekeeping system to reverse the automatic deduction so that the correct number of hours worked by agents were reflected therein. If the missed break was attributable to the nature of the work—*i.e.*, if the agent was simply too busy to take a break on a particular day—the agent was required to submit a "NO LUNCH" form to ATS so attesting. I have reviewed these "NO LUNCH" forms, and they clearly state at the top that, "[g]iven the nature of the work at ATS, there are times when an employee may not be able to take a lunch period." A true and correct, redacted copy of one such "NO LUNCH" form is attached hereto as **Exhibit 2**.

8. With respect to each instance when a "NO LUNCH" form was submitted, ATS marked the relevant agent's time records with a "NO LUNCH" notation. According to data provided by ATS to the Claims Administrator, there were a total of 4,965 such "NO LUNCH" codings across the Settlement Class. (Oct. 21, 2013, Sherwood Decl. [Docket No. 46] ¶ 5.) These 4,965 "NO LUNCH" codings were experienced by 549 agents. (Oct. 21, 2013, Sherwood Decl. [Docket No. 46] ¶ 5.) According to Plaintiff, she herself experienced at least ten such codings since November 2011. (July 8, 2013, Supplemental Decl. of Collette McDonald in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class ("July 8, 2013, McDonald Decl.") [Docket No. 33] ¶ 2.) Based on my discussions with Plaintiff, on a review of her pay records, and on my interviews with various airport agents employed by ATS since November 2007, ATS *never* paid the meal-period "premium" wage specified

by California Labor Code section 226.7 for any of these "NO LUNCH" workdays. ATS itself has been extremely forthcoming in terms of explaining its "NO LUNCH" policies and confirmed during settlement negotiations that it never pays meal-period wages for these codings. Again, this was ATS's policy notwithstanding the fact that the "NO LUNCH" forms attribute the reason for the missed meals to the nature of the work at ATS.

9. In connection with negotiating the Settlement Agreement, ATS provided my office with data indicating that the average hourly wage for the Settlement Class was $12.47. Accordingly, under section 226.7, the average amount owing per "NO LUNCH" workday is $12.47, bringing the total meal-period damages for Plaintiff's "NO LUNCH" claim to $61,913.55 (= 4,965 "NO LUNCH" workdays × $12.47 hourly wage). Assuming an even distribution of the 4,965 "NO LUNCH" codings across the 549 affected agents, each such agent experienced an average of 9 "NO LUNCH" codings. On a *per capita* basis, then, each of the 549 agents is entitled to approximately $112 (= $12.47 hourly wage × 9 "NO LUNCH" workdays) in meal-period premium pay under section 226.7.

10. Under the Settlement Agreement, ATS has agreed to make a Gross Settlement Payment of $250,000. The Gross Settlement Payment includes amounts for fees, expenses, and a possible incentive payment to Plaintiff; after deducting those amounts, the remaining portion (the "Net Settlement Fund") will be distributed to Class Members who have submitted valid claim forms. Assuming that the Court approves $82,500 in attorney's fees (equal to 33% of the Gross Settlement Payment), $8,069.34 in litigation expenses, $20,000 in claims-administration expenses, and a $5,000 incentive award, $134,430.66 will remain for distribution to participating Class Members. Under the Settlement Agreement, 33.33% of this Net Settlement Fund, *i.e.*, $44,805.74, will be shared by those of the 549 "NO LUNCH" agents who submitted valid claim forms. In other words, although the Settlement Class consists of 1,238 agents, this 33.33% "sub-fund" is earmarked exclusively for the 549 agents who experienced "NO LUNCH"

8
DECL. OF ALAN HARRIS IN SUPP. OF MOT. FOR FINAL APPROVAL OF CLASS-ACTION SETTLEMENT

codings.

11. Based on statistics provided to me by the Claims Administrator, of the 1,238 individuals in the Settlement Class, 376 submitted claim forms. (Oct. 21, 2013, Sherwood Decl. [Docket No. 46] ¶ 14.) Of those 376 Class Members, 195 have "NO LUNCH" codings, and the total number of "NO LUNCH" codings for these 195 Class Members is 1,663. (Oct. 21, 2013, Sherwood Decl. [Docket No. 46] ¶ 14.) Based on these figures, the average, pre-tax net settlement payment to each of these Class Members is $230 (= $44,805.74 ÷ 195 Class Members), or $27 per "NO LUNCH" workday (= $44,805.74 ÷ 1,663 "NO LUNCH" workdays). Accordingly, the average recovery per "NO LUNCH" workday more than doubles the average amount owing, and participating Class Members stand to receive $118 more than the average *per capita* damages calculated in paragraph 9 above.

12. The estimated recoveries calculated in paragraph 11 above are averages. Under the Settlement Agreement, the $44,805.74 portion of the Net Settlement Fund allocated for Plaintiff's "NO LUNCH" claim will be shared by participating Class Members based on the relative number of "NO LUNCH" codings they experienced. This ensures that the $44,805.74 will be divided in the most equitable manner possible, with participating Class Members who experienced relatively more "NO LUNCH" workdays receiving a larger share than those who experienced relatively fewer "NO LUNCH" workdays. Specifically, using the figures computed in paragraph 11 above, some participating Class Members will receive more than $230, and some will receive less than $230.

13. ***Plaintiff's Underlying Uniform-Cleaning Claim***. Plaintiff's expense-reimbursement claim, brought pursuant to Labor Code section 2802, is limited to the allegation that ATS failed to reimburse airport agents for the costs of maintaining their uniforms. As with the meal-break claim, because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing expense-reimbursement claims that stem from

the uniform-cleaning allegations, leaving intact any claims for the failure to reimburse for other expenses. Based on my discussions with Plaintiff, on my interviews with various airport agents employed by ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process, ATS required all of its airport agents to wear work uniforms, including Plaintiff herself. Based again on that same information—particularly on my interviews with numerous airport agents—although these uniforms were provided to agents free of charge, agents were told that it was their responsibility to keep their uniforms clean. According to airport agents, ATS never explained to them that they could request cleaning-cost reimbursement, and ATS never provided any such reimbursement. Plaintiff herself declares as much in her Declaration. (July 8, 2013, McDonald Decl. [Docket No. 33] ¶ 4.)

14. Under the Settlement Agreement, in satisfaction of Plaintiff's uniform-cleaning claim, 66.67% of the $134,430.66 Net Settlement Fund, *i.e.*, $89,624.92, will be distributed on a *pro rata* basis to those of the 1,238 agents who have submitted valid claim forms. Again, based on statistics provided to me by the Claims Administrator, of the 1,238 individuals in the Settlement Class, 376 submitted claim forms. (Oct. 21, 2013, Sherwood Decl. [Docket No. 46] ¶ 14.) Each such Class Member will therefore receive a pre-tax award of $238 (= $89,624.92 ÷ 376 Class Members). These awards are on top of whatever amounts Class Members will receive for their "NO LUNCH" codings. In my opinion, these amounts are reasonable to compensate employees for the costs of maintaining their uniforms. In this regard, I have had an opportunity to personally examine agents' uniforms, and, during my investigation, many airport agents explained to me that there was no directive from ATS that their uniforms be dry-cleaned. In addition, during my discussions with various agents and with Defendant during the settlement-negotiation process, I was made aware of the fact that, in lieu of cleaning their uniforms, agents could simply request new garments from ATS. These facts minimize the extent of damages attributable to uniform-cleaning costs.

15. ***The Reasonableness of the Estimated Payments***. To recap, based on the

above figures, participating Class Members will receive, on average, $230 for their "NO LUNCH" codings (to the extent they experienced any such codings) and $238 for uniform-cleaning reimbursement. After extensive discussions with my colleagues, I have formed the opinion that these amounts are fair. First, as noted above, the meal-period settlement amounts will provide participating Class Members with *more* than 100% of what is actually owed under section 226.7 of the Labor Code. In addition, because agents' uniforms were not required by ATS to be dry cleaned, the reimbursement portion of the settlement represents a significant recovery for arguably minimal damages.

16. I note that the Settlement Agreement seeks to resolve derivative claims for improper pay stubs and continuing wages stemming from the two underlying causes of action alleged in the Complaint. As with the underlying claims for missed meals and expense reimbursement, because the Settlement Agreement's release is limited to the factual allegations in the Complaint, agents who do not exclude themselves from the settlement will only be releasing derivative pay-stub and continuing-wage claims that stem from the "NO LUNCH" and uniform-cleaning allegations. Moreover, as explained in Plaintiff's Memorandum filed herewith, the Airline Deregulation Act ("ADA") may operate to preempt Plaintiff's meal-period claims. ATS has strenuously advanced the ADA preemption defense since this case's inception and throughout the entirety of the settlement-negotiation process, particularly during the mediation. According to ATS, compliance with California's meal-period statute would have an immediate effect on the scheduling of flights and an ultimate "pass-through" effect on air fare. If ADA preemption applies, then *none* of the Settlement Class are entitled to *any* meal-period damages, let alone damages stemming from Plaintiff's meal-period-derivative claims. Furthermore, also as discussed in Plaintiff's Memorandum filed herewith, even if Plaintiff's underlying meal-period claim is not preempted, recent Central District of California authority holds that derivative claims under sections 203 and 226 cannot be based on violations of California's meal-period statute. The recoveries noted in paragraph 15 above are therefore reasonable in light of the risk discounts that apply in the

context of settlement. For instance, consider Plaintiff's pay-stub claim. The pay-stub claim is based on the Labor Code's requirement that wage statements be provided to employees with each paycheck, listing the correct amount of gross and net wages earned. The claim is derivative in the sense that, whenever ATS coded a "NO LUNCH" workday for an airport agent, ATS should have paid a missed-break wage—a wage that should have appeared on the agent's pay stub. Because Plaintiff's pay-stub claim is wholly derivative of the missed-meal allegations, it is limited to those 549 Settlement Class members who experienced "NO LUNCH" workdays. As noted in paragraph 8 above, each Settlement Class member experienced, on average, a total of nine "NO LUNCH" workdays. Accordingly, on average, each Settlement Class member received, at most, nine separate pay stubs that failed to list additional wages for "NO LUNCH" workdays.[2] Under the Labor Code, total statutory damages for these violations equal $850. See Cal. Lab. Code § 226(e) (specifying damage amounts of $50 for the initially defective pay stub and $100 for each defective pay stub thereafter). As explained in paragraph 15 above, participating Class Members will each receive, on average, $230 from that portion of the Net Settlement Fund allocated to address the Complaint's meal-period claim. Because, on average, each Settlement Class member has only $112 in "actual" meal-period damages, the additional $118 that each participating Class Member will receive represents 14% of total pay-stub damages, to say nothing of the $238 in additional proceeds they will receive from the non-meal portion of the settlement.

    17. ***The Settlement Agreement's Non-Monetary Relief***. In addition to providing the above-described monetary relief, the Settlement Agreement requires ATS to request the installation of additional, regulator-permitted seating for its agents at airport worksites. The Settlement Agreement also requires ATS to request the installation of regulator-permitted mats at its airport worksites in order to alleviate the

---

[2] Of course, it is possible that all "NO LUNCH" workdays experienced by a given agent occurred over the course of, say, two pay periods, meaning that he or she received only two defective pay stubs, not nine. In other words, nine pay-stub violations occur only if each "NO LUNCH" workday occurred in its own pay period.

stress of standing when seating is an impossibility. This relief is designed to address Plaintiff's allegations in the Complaint that ATS failed to provide adequate seating at its airport worksites. As explained in Plaintiff's Memorandum filed herewith, the seating allegations have been resolved on a non-monetary basis because, under the current state of the law, claims for improper seating do not give rise to claims for damages. Based on my discussions with Plaintiff, on my interviews with various airport agents employed by ATS since November 2007, and on the full and frank exchange of information throughout the settlement-negotiation process—including the provision by ATS of photographic evidence documenting the locations in which it presently does provide employee seating—I have concluded that this non-monetary relief is appropriate. This is particularly true in light of the fact that, because Plaintiff is a former employee, she lacks standing (so to speak) to obtain such relief after a full trial on the merits of her seating claim. It is also true in light of the fact that many members of the Settlement Class work "under wing" on airport tarmacs, meaning that they are arguably required to be on their feet while at work.

### *Class Counsel's Fee Request*

18. On September 26, 2013, my office filed a Motion requesting $82,500 in attorney's fees and $8,069.34 in incurred litigation expenses from the $250,000 common fund. (See generally Sept. 26, 2013, Pl.'s Notice of Mot. & Mot. for Award of Att'ys Fees & Reimbursement of Costs; Mem. of P. & A. in Supp. Thereof ("Sept. 26, 2013, Mot. for Fees") [Docket No. 38].) As explained in that Motion, Class Counsel's unadjusted lodestar (*i.e.*, with no multiplier) is $127,358.25, computed as a function of the following hours and rates:

/ / / / /

| Table 1: Class Counsel's Requested Hourly Rates ||||||
|---|---|---|---|---|
| *Attorney* | *JD Acquired* | *Hourly Rate* | *Hours* | *Lodestar* |
| A. Harris | 1974 | $600 | 63.40 | $38,040.00 |
| J. Dorigan | 1981 | $450 | 82.60 | $37,170.00 |
| D. Zelenski | 2003 | $322.50 | 161.70 | $52,148.25 |
| Total | --- | --- | 307.70 | $127,358.25 |

(Sept. 26, 2013, Mot. for Fees [Docket No. 38] at 21:3–14.) According to the time records submitted with the Motion for fees, my hourly rate is actually $800, and Mr. Zelenski's hourly rate is actually $430. (Sept. 26, 2013, Decl. of Alan Harris in Supp. of Pl.'s Mot. for Award of Att'ys Fees & Reimbursement of Costs ("Sept. 26, 2013, Harris Decl.") [Docket No. 39] Ex. 3 at 29.) As reflected in the above table, Class Counsel's lodestar has therefore been computed based on a reduced hourly rate of $322.50 for Mr. Zelenski and $600 for me. This reduced lodestar exceeds the requested fees by $44,858.25.

19.  As explained in the Motion for fees, Class Counsel's lodestar can be recomputed based on the Laffey matrix. (Sept. 26, 2013, Mot. for Fees [Docket No. 38] at 22:14–24:15.) Under the Laffey matrix, as adjusted for the Central District of California, Class Counsel's lodestar amounts to the following:[3]

| Table 2: Class Counsel's Laffey Rates ||||||
|---|---|---|---|---|
| *Attorney* | *JD Acquired* | *Hourly Rate* | *Hours* | *Lodestar* |
| A. Harris | 1974 | $789.50 | 63.40 | $50,054.30 |
| J. Dorigan | 1981 | $789.50 | 82.60 | $65,212.70 |
| D. Zelenski | 2003 | $580.61 | 161.70 | $93,884.64 |
| Total | --- | --- | 307.70 | $209,151.64 |

---

[3] The Central District adjustment is based on cost-of-living data from the U.S. Office of Personnel Management. (Sept. 26, 2013, Mot. for Fees [Docket No. 38] at 23:8–24 & n.10.) Copies of relevant data from the U.S. Office of Personnel Management were attached as Exhibit 8 to the Declaration of Alan Harris filed in support of the Motion for fees. (Sept. 26, 2013, Harris Decl. [Docket No. 39] ¶ 23 & Ex. 8.) In the Motion, Plaintiff noted that these data were available online at http://www.opm.gov/policy-data-oversight/payleave/salaries-wages/#url=2013. Since the filing of that Motion, it appears that that specific web address is no longer active; the data can be found at the following new address: http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2013/general-schedule/.

14
DECL. OF ALAN HARRIS IN SUPP. OF MOT. FOR FINAL APPROVAL OF CLASS-ACTION SETTLEMENT

Based on the adjusted <u>Laffey</u> matrix, Class Counsel's lodestar increases by over $80,000.

20. As to costs, the Settlement Agreement permits Class Counsel to request reimbursement for incurred litigation expenses of up to $15,000. To date, Class Counsel have advanced all costs incurred in this case. As reflected on Harris & Ruble's time records submitted with the Motion for fees, total incurred litigation expenses come to $8,069.34. (Sept. 26, 2013, Harris Decl. [Docket No. 39] ¶ 24 & Ex. 3 at 31.) Because Class Counsel are seeking only $8,069.34 in costs, the remaining $6,930.66 will be distributed to participating Class Members as part of the Net Settlement Fund.

### *Class Notice*

21. In granting preliminary approval of the Settlement Agreement, the Court approved the form of the Class Notice, claim form, and request-for-exclusion form to be delivered by the Claims Administrator to the Settlement Class. The parties selected Gilardi & Co., LLC as the Claims Administrator—a well-established firm based in San Rafael, California that my office has successfully used in other class-wide wage-and-hour settlements. Details concerning the dissemination to the Settlement Class of the Class Notice, claim form, and exclusion-request form, as well as of the Settlement Class' response thereto, are set forth in the concurrently filed Declaration of Markham Sherwood.

I have read the foregoing, and the facts set forth therein are true and correct of my own personal knowledge. Executed October 21, 2013, in the County of Los Angeles, State of California.

                                                           /s/ *Alan Harris*
                                                          Alan Harris